HAVANA ELECTRIC RAILWAY, LIGHT & POWER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 40304, 42570, 47339. Promulgated February 21, 1934.

*J. Marvin Haynes, Esq.,* and *R. R. Loening, Esq.,* for the petitioner.

*Philip M. Clark, Esq.,* and *Stanley B. Pierson, Esq.,* for the respondent.

1154

OPINION.

SMITH: The question presented is whether or not certain taxes paid to the Municipality and Province of Havana, Cuba, by the petitioner may be used as a credit on petitioner's tax liability to the United States. Section 238 (a) of the Revenue Act of 1918 and a similar section in the Revenue Acts of 1921, 1924, and 1926 are as follows:

That in the case of a domestic corporation the total taxes imposed for the taxable year by this title and by Title III shall be credited with the amount of any income, war-profits and excess-profits taxes paid during the taxable year to any foreign country, upon income derived from sources therein, or to any possession of the United States.

After the filing of the agreed statement of facts, respondent introduced Dr. Cardenas as an expert on Cuban tax laws. His evidence was objected to by petitioner, and it is now earnestly argued on brief by petitioner that his evidence is incompetent and should be excluded. Petitioner insists that the proper method of proving Cuban statutory laws is by proper certified copies of the statutes, and not by the evidence of an expert witness, and that in this case the statutes themselves were put in evidence by the agreed statement of facts.

Ordinarily the law of a foreign country may be proved by certified copies of the law, an expert witness, or an examined copy of the law. Where the statutes have been introduced in evidence we see no objection to obtaining the assistance of an expert also, though we are not bound to follow the construction placed on the law by the expert. In 4 Wigmore on Evidence, § 1953, the law is thus stated:

> No doubt has ever been made that properly skilled testimony may be sought in proving the existence of a foreign rule of law in general. The question that involves the present principle is: When the *text of a foreign statute* is before the Court, may any aid be received in construing or interpreting it? No one doubts that the aid of a mere translator is proper. But when a translation, if necessary, has been made, is anything further needed in the way of comment on the text?
>
> The answer has always and properly been that such aid may at any time be needed and may always be offered. The effect of this conclusion, however, must be distinguished from the effect of the rule of producing the verbatim text (ante, § 1271); that is, assuming the production of the complete text, the present question remains, whether an expert's interpretation of that text is admissible:
>
> 1844, Denman, L. C. J., in *Baron de Bode's Case*, 8 Q. B. 265: " There is another general rule, that opinions of persons of science must be received as to the facts of their science. That rule applies to legal men . . . . Properly speaking, the nature of such evidence is, not to set forth the contents of the written law, but its effect and the state of law resulting from it. The mere contents, indeed, might often mislead persons not familiar with the particular system of law; the witness is called upon to state what law does result from the instrument."
>
> 1844, Lord Brougham, in *Sussex Peerage Case*, 11 Cl. & F. 115: " It is perfectly clear that the proper mode of proving a foreign law is not by showing to the House the book of the law; for the House has not organs to know and to deal with the text of that law, and therefore requires the assistance of a lawyer who knows how to interpret it."

In *Slater* v. *Mexican Natl. Ry. Co.*, 194 U.S. 120, the Supreme Court had before it the proper construction of certain Mexican laws relative to the liability of the railway company, to the widow and children of one of its employees killed through negligence of the railway company in Mexico. The written or statutory law was introduced in evidence, but the trial court rejected the expert testimony

of a Mexican lawyer as to its effect and construction. In holding this to be error, the Court said:

But what we last have said brings into consideration another error of the Circuit Court which hitherto we have not mentioned. The defendant offered the deposition of a Mexican lawyer as to the Mexican law. This was rejected, subject to exception, seemingly on the ground that the agreed translation of the statute was the best evidence. So no doubt they were, so far as they went, but the testimony of an expert as to the accepted or proper construction of them is admissible upon any matter open to reasonable doubt. Many doubts are left unresolved by the documents before us. The expert would have testified that where no criminal proceedings had been had, the right of the widow and children was dependent upon the court's finding that the killing was a crime as defined by the penal code, and that the right was in the nature of alimony or pension to be paid in installments for periods of time fixed by the court. Without stating his testimony more fully, we have said enough to show that it should have been received.

See also *In re Mahogany Co.*, 147 Fed. 147, where it was held that the evidence of an expert was admissible to explain the mortgage laws of Cuba, and *Herbst* v. *S. S. Asiatic Prince*, 108 Fed. 289, where a like ruling was made as to the laws of Brazil. The court said in the latter case:

\* \* \* Whether or not it is the law and usage in Santos is a question of fact, the burden of proving which is on the party asserting its existence. The law of a foreign country [is] proved here by calling its lawyers \* \* \* and interrogating them. That has been done in this case, with a result which certainly warrants the conclusion that the proof is overwhelmingly the one way. It is true that as to the law of Brazil the only witness called by the claimant was a young lawyer, but his statements are direct, positive, and reiterated, \* \* \* and there is no reason apparent why his statements should not be accepted. \* \* \* There was abundant opportunity to take the testimony of some other lawyer, \* \* \* if the statements of claimant's witness were inaccurate; \* \* \* but libelant has contented himself with printing copious excerpts from the statute law of Brazil, which he insists do not sustain the witness' statement. \* \* \* Such a method of criticising the testimony of a foreign lawyer as to the law which prevails in his country is unpersuasive. There is much more than the text of a statutory enactment to be considered. Departmental regulations, administrative construction, judicial exposition, are often quite as important.

Dr. Cardenas was shown to be qualified to appear and testify as an expert on Cuban tax laws, and we hold that his testimony was competent and admissible.

Taxes paid to the Municipality of Havana by petitioner were paid under ¶ 131 of the Third Tariff of the Annexes to the Municipal Tax Law and Collection Procedure of Cuba as follows:

Gas and Electric Light Works belonging to stock companies or private persons, shall pay six per cent of their net earnings. For the purposes of the tax, the net earnings shall be considered to be the amount resulting from their balances, deducting from their receipts the expenses, properly vouchered, for all items of operation and maintenance of the business to which they are dedicated.

The taxes paid the Province of Havana were paid under article 63 of the Organic Provincial Law of Cuba as follows:

Article 63. The Councils (Provincial Councils), besides the income from properties owned by the Province, may establish the necessary revenue in order to meet the expenses established in their budgets, which revenue, which is hereby declared compatible with the tax system of the state, shall be calculated, as surcharge, on some or all of the municipal taxes, provided for in the municipal budget, then in force, at a rate which in no case shall exceed 4% on the real estate tax in the Province of Havana and, in the other provinces, 20% on urban properties and 15% on rural properties. On other municipal taxes the surcharge may be as high as 25% in all the provinces.

The provincial taxes were collected by and paid through the Municipality of Havana. In his evidence Dr. Cardenas gives in great detail the history, purpose, and construction of the above taxing acts from 1877 to the present time, showing that they have always been considered and construed as among taxes upon the carrying on and exercise of industries, commerce, professions, arts, and trades, viz., a tax upon the privilege of doing business and not an income tax. Without following the history of these laws in detail it is sufficient for our purpose to state that industrial taxes have been in force in Cuba since 1877. Originally they were levied by and for the benefit of the central government, with the right in the municipalities to levy a surcharge of 25 percent. These taxes were fixed and assessed in various ways. In some instances a fixed sum was prescribed, dependent upon the size of the community where exercised; some industries paid on gross output; insurance companies paid on the amount of premiums collected; and in some instances the municipalities had the right to fix the amount of the tax. Between 1877 and 1908 the benefit of these industrial taxes was transferred from the central government to the municipalities and back again by various military orders until in 1908, at the time of the second American intervention, a commission was established by the Provisional Governor, Charles E. Magoon, for the purpose of codifying and classifying the various tax laws of Cuba and assigning them to the different governmental units. The result of the work of the commission was properly promulgated by governmental decrees. The laws so established were the Organic Municipal Law of Cuba, Exhibit 1 in this record, and the Municipal Tax Law and Collection Procedure of Cuba, Exhibit 2 in this record, which were in effect during the taxable years. Title V of the Organic Municipal Law of Cuba treats of the municipal treasury. Chapter I of that title contains general provisions for the conduct of the treasury. Chapter II relates to municipal budgets; chapter III provides for collections; and chapter IV relates to the municipal revenues.

In article 216 of chapter IV is found the authority of municipalities to provide revenue as follows:

The municipal councils may establish the revenues necessary to meet the expenditures provided for in the budgets, aside from the income of the municipality derived from its communal property and from any other legitimate sources, conforming, for this purpose, to the following basis and maximum rates of taxation which, for said purpose, are declared compatible with the system of taxation of the state.

Then follow 19 subsections to article 216 providing for the various kinds of taxes and the rates thereof which the municipalities are permitted to levy. The two subsections authorizing the taxes in controversy herein are (3) and (7)(b). Subsection (3) reads:

Tax on the exercise of industries, commerce, professions, arts and trades, which shall not exceed the rates fixed by classes and headings in the first three tariffs attached to the law of municipal taxation, and which may be freely regulated by the municipal council as to the remaining tariffs.

Subsection (7) authorizes:

A tax not exceeding eight per cent of the net profits of companies or copartnerships doing business with funds contributed by the members thereof at one time, or at periodical or irregular intervals. When their by-laws or regulations contain penal clauses for nonpayment, or other clauses of a similar character, they shall pay not more than eight per cent on their gross receipts.

This tax shall be paid to the municipality in which the company has its legal domicile. The following are excepted: (a) Savings banks, pawnshops and mining companies; insurance companies and banks of issue and discount, which pay taxes to the state by virtue of another law. (b) Those companies or copartnerships which are comprised in any manner in the tariffs attached to the law of municipal taxation, or in the tariffs freely regulated by the municipal councils, and which, as industrial enterprises, pay taxes to the municipality.

It appears from subsection (7) and its exceptions that it does not apply to certain classes of taxpayers that pay taxes to the state, nor does it apply to such as pay taxes to the municipalities under the tariffs attached to the law of municipal taxation as industrial enterprises. Coming now to consider the Municipal Tax Law, Exhibit 2, and referred to in exception (b) to subsection 7 above quoted, we find that Title II thereof is entitled "Tax upon the exercise of Industries, Commerce, Professions, Arts and Trades," and that article 62 provides "The tax, to which this title refers is number three of Article 216 of the Organic Municipal Law," and article 63 provides:

Persons subject to the payment of this tax are such as carry on within the territory of a municipality, whether a permanent resident of the district or not, any industry, commerce, profession, art or trade included in the tariff regulated by each municipal council, except those exempted in the table appended to this law.

Article 67 provides:

\* \* \* for each industry, commercial enterprise, profession, art or trade, the quota assigned thereto in the respective tariff shall be paid to the municipality, according to the basis of population, or the basis that the municipal council may have determined upon.

The tariffs or schedules of taxes annexed to the Municipal Tax Law are entitled "Maximum Tariffs for the collection of the taxes and fees on the operation of Industries, Commercial Pursuits, Professions, Arts and Trades." Then follow three sets of tariffs in which the amount or rate of the tax is fixed, and a list of such industries which are subject to whatever tax or rate the municipal council may fix. In Tariff 3, section 131, it is provided:

Gas and electric light works belonging to stock companies or private persons, shall pay six per cent of their net earnings. For the purposes of the tax, the net earnings shall be considered to be the amount resulting from their balances, deducting from their receipts the expenses, properly vouchered, for all items of operation and maintenance of the business to which they are dedicated.

From this resume of the Cuban laws under which these municipal and provincial taxes were assessed and collected it seems clear to us that they were taxes upon the doing of business, or industrial taxes, and not income, war profits, or excess profits taxes. They are so denominated in every instance where they are mentioned or authorized. Article 62 of the Municipal Tax Law states that the tax to which it refers is authorized by number three of article 216 of the Organic Municipal Law, and number three of article 216 only provides for taxes on the exercise of industries, commerce, professions, arts, and trades. By reason of the exception (b) to subsection (7) of article 216 of the Organic Municipal Law, it is clear that these taxes are levied under subsection three of article 216, and that they are expressly excepted from the operation of subsection 7 by exception (b).

The expert witness, Dr. Cardenas, answering a hypothetical question based on the facts of this case, gave it as his opinion that these taxes were taxes for the privilege of doing business, and were not income taxes, and that the mere fact that petitioner paid a certain per centum on net earnings did not constitute the tax an income tax, as the same method of fixing the tax was employed with reference to insurance companies for the privilege of doing business. The witness referred to and fortified his opinion by citations of decisions of the Havana Court of Appeals and the Supreme Court of Cuba. In the first case, being respondent's Exhibit B, hereby referred to as Sentencia 685, pages 253–4 Repertorio Judicial, number of June 1931, the court held that the petitioner was not taxable under subsection 7 of article 216 of the Organic Municipal Law, requiring it to pay

the tax to the municipality where it had its domicile, but that it was taxable under section 131, Tariff 3, and should pay the tax therein provided in each municipality where it had factories according to the income earned in each. This case was affirmed by the Supreme Court, but on a question of procedure. It is proper here to say that the taxes in controversy have been allowed as deductions.

Beginning in 1917 and extending down to the present time the National Cuban Government has levied and collected a national income tax in some form, concerning which there is no controversy. The petitioner has paid and been allowed credit for payments made on account of this income tax in the amounts shown in paragraph 13 of the agreed statement of facts and on recomputation will be allowed as credits the amounts set up in paragraph 14.

It is insisted by petitioner that because the taxes involved here were measured by net earnings, they are necessarily income taxes, but such is not the law. Many kinds of taxes such as franchise taxes, privilege taxes, and different forms of excise taxes may be and are based on gross receipts, net earnings, or income. The purpose for which the tax is levied must be considered, and the language used in the law and in denominating it by the lawmaking body is entitled to great respect. Here there is nothing in any of the municipal tax laws of Cuba which indicates an income tax or a purpose to tax incomes as such, but on the contrary it is everywhere called a tax on the exercise of an industry. The only clause which leans toward an income tax is subsection 7 of article 216, Organic Municipal Law, which the Court of Appeals of Havana held did not apply to petitioner.

In *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, the Court said:

While the mere declaration contained in a statute that it shall be regarded as a tax of a particular character does not make it such if it is apparent that it cannot be so designated consistently with the meaning and effect of the act, nevertheless the declaration of the lawmaking power is entitled to much weight, and in this statute the intention is expressly declared to impose a special excise tax with respect to the carrying on or doing business by such corporation, joint stock company or association, or insurance company. * * *

In that case the Court had before it the validity of the corporation tax imposed by the Tariff Act of 1909, which depended on whether it was a direct tax or an excise tax. The act provided in substance that every corporation, joint stock company, or association organized for profit and having a capital stock represented by shares, and every insurance company shall be subject to pay annually a special excise tax with respect to the carrying on or doing business equivalent to one per centum upon the entire net income over and above five thousand dollars. The Court held that the tax was imposed on the doing of business of the character described, and that the

measure of the tax was the income, and that it was an excise tax. It was further held that the tax was constitutional and not subject to apportionment as income taxes were prior to the Sixteenth Amendment. To the same effect is the case of *Spreckels Sugar Refining Co.* v. *McClain*, 192 U.S. 397, in which a special tax measured by the gross receipts of the business of refining oil and sugar was sustained as an excise in respect to the carrying on or doing of such business.

In *Security Savings & Commerce Bank* v. *District of Columbia*, 279 Fed. 185, a tax on gross earnings was held a franchise tax, and in *Potomac Electric Power Co.* v. *Rudolph*, 29 Fed. (2d) 634, a tax on gross receipts was held a franchise tax as distinguished from a property tax.

The cases of *Herbert Ide Keen*, 15 B.T.A. 1243, and *Chicago Portrait Co.*, 16 B.T.A. 1129; affd., 285 U.S. 1, relied upon by petitioner, do not militate against our views herein. In the first we sustained a French tax levied as and denominated an income tax by the French Government, and in the latter it was held that a self-governing province of Australia was a foreign country and that income taxes paid to it were a credit against United States income tax liability. In those cases the foreign taxes were income taxes, while in the instant case they are not. We hold that the taxes in controversy were not income, war profits or excess profits taxes paid to a foreign country within the meaning of section 238 (a) and may not be used as a credit on United States income taxes for the taxable years.

The respondent's action in so holding is approved, but, on account of certain corrections to be made under the agreed statement of facts,

Reviewed by the Board.

*Judgment will be entered under Rule 50.*