JAMES SPEYER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56435. Promulgated April 27, 1934.

*Henry W. Taft, Esq.*, and *C. W. McConaughy, Esq.*, for the petitioner.

*Prew Savoy, Esq.*, for the respondent.

SEAWELL: This proceeding was instituted to redetermine a deficiency of $48,643.92 in income tax for 1928. The primary facts are set forth in a voluminous stipulation of facts. Only so much of the agreed facts will be stated as is necessary for a clear understanding of the several issues raised by the pleadings, which are whether the respondent erred:

(1) In increasing gross income by $181,535.45 on account of payments received on awards of the Mixed Claims Commission;

(2) In refusing to allow as a deduction losses sustained on the accounts which formed the basis of the awards;

(3) In disallowing a deduction of $48,591.24 for attorney fees paid for services rendered in connection with the awards;

(4) In disallowing a credit of $59,805.31 for income tax paid to the German Government; and

(5) In allowing too large an amount as a deduction for contributions.

## I.

The petitioner is and was, at all times important here, a citizen of the United States, a resident of New York, and a member of the firm of Speyer & Co., a copartnership conducting a banking business in New York City. Prior to April 4, 1917, he was also a member of the firm of Lazard Speyer-Ellisson, a copartnership conducting a banking business at Frankfort-am-Main, Germany, hereinafter referred to as the German partnership.

On April 6, 1917, there were owing to the petitioner and Speyer & Co. amounts represented by deposits and balances in accounts with banks and bankers in Germany, including the German partnership.

Excepting four items belonging to clients of Speyer & Co., since December 31, 1923, the petitioner has been the sole owner of said deposits and accounts and of the awards made by the Mixed Claims Commission, hereinafter referred to as the Commission, with respect thereto.

On or about December 31, 1922, the petitioner and Speyer & Co. filed 10 claims with the Commission respecting the deposits and accounts with German banks and bankers. Upon these claims the Commission entered awards in favor of the petitioner as follows:

| Number | Date | Principal amount |
|---|---|---|
| 5958 | October 30, 1925 | $415.64 |
| 6256 | " " " | 6,843.47 |
| 6375 | Jan. 13, 1926 | 63.84 |
| 6583 | Feb. 3, 1926 | 160,066.85 |
| 7293 | Nov. 8, 1926 | 181,309.63 |
| 7550 | Nov. 23, 1927 | 648,039.04 |
| | Total | 996,738.47 |

The principal amount of some of the awards included an allowance for interest to April 6, 1917, as claimed by the claimants. Each award was made with interest at the rate of 5 percent per year from designated dates, in most cases January 1, 1920.

Pursuant to the provisions of the Settlement of War Claims Act of 1928, 45 Stat. 254, the Secretary of the Treasury on September 26, 1928, made two payments to the petitioner on account of the sums due him under the six awards, one in the amount of $99,500 and the other in the amount of $386,412.43, a total of $485,912.43, after deducting $2,441.77 as reimbursement for expenses incurred by the United States as allowed by section (2)(e) of that act. The respondent first included one half of this sum in petitioner's taxable income on the theory that the payments were made for the equal benefit of the petitioner and a former member of Speyer & Co. In his answer to the petition he asserted a claim to tax on the whole amount. In his answer to the amended petition the respondent admitted error in asserting a tax on more than $181,535.45 of the payment.

The respondent pursued the following method in determining that $181,535.45 of the amount received in 1928 constituted taxable income of the petitioner. He first made an analysis of each item of each award and allocated the amount thereof to return of capital and income. For instance, of the amount of award No. 5958, he determined that $411.69, the principal of the bank deposits, was a return of capital, and the balance of $3.95, representing interest on the deposits from dates set forth in the stipulation to April 6, 1917, none of which was credited to the accounts by the respective banks,

was income. The two items of bank deposits, without interest, constituting award No. 6256, have no basis within the meaning of section 113 of the Revenue Act of 1928, and, accordingly, the respondent treated the entire award of $6,843.47 as income. Under award No. 6583 he found that a loan of 41,121.27 marks, deducted as a loss in petitioner's return for 1913, together with interest thereon for 1916 in the amount of 7,764.76 marks, constituted income. In award No. 7293 he determined that dividends credited to one of petitioner's accounts with the German partnership prior to December 31, 1920, and certain depository fees, no part of either of which credits the petitioner ever reported as income for tax purposes, constituted taxable income. By this process he determined that of the aggregate principal amount of $996,738.47 awarded by the Commission, $852,660.31 represented a return of capital and $144,077.78, income. [Respondent's figures are short 38 cents.] He then computed interest on the awards from the dates allowed by the Commission to January 1, 1928, in the amount of $391,936.78, which he calls income to the petitioner. He then reached the figure of $181,535.45 by the following computation:

Capital to be returned ($852,660.31 less $14,597.79 belonging to
  clients) _____ $838,062.52
Income as of Jan. 1, 1928 ($144,077.78 plus $391,936.78) _____ 536,014.56
Percentage of payments—Return of capital_____ 61%
                       Income_____ 39%
Payments in 1928 ($485,912.43 less $20,436.91 received for the
  account of clients) _____ $465,475.52
Return of capital  61%_____ 283,940.07
Taxable income    39%_____ 181,535.45

This method of allocating payments is in accordance with G.C.M. 9210, C.B. X-1, p. 129, applicable to taxpayers, such as the petitioner, reporting income on the cash basis, and G.C.M. 9466, C.B. X-1, p. 133, relating to taxpayers on the accrual basis. The respondent adheres to this theory of prorating the payments, and the petitioner insists that he is entitled under the rule stated in *Burnet* v. *Logan*, 283 U.S. 404, to a return of his capital before being taxed on any payments made under the awards.

Under the respondent's method of allocating the payments the petitioner is taxed on but a part, instead of all, of the payment allocable to awards, such as No. 6256, where the parties are agreed there is no investment to recover. In other awards where the amount assigned to income is less than the average, he is called upon to pay a tax on an amount in excess of his real income. The interest on the awards prior to January 1, 1928, represents about 70 percent of the whole of the income items determined by the respondent, yet by September 30, 1932, only about 2 percent of the amount paid to claimants of

petitioner's class, was applicable to such interest. It does not appear, and it is not claimed, that any part of the payments made in 1928 included interest on the awards prior to 1928. These few illustrations serve, we think, to show the inequity of the respondent's method. Under it there will not be a recovery of the petitioner's cost or other basis until the last installment is paid, irrespective of when that occurs.

The respondent cites no authority to support his method of taxing the payments and there appears to be none in point. Taxation is eminently practical, *Tyler* v. *United States*, 281 U.S. 497, and " Generally speaking, the income tax law is concerned only with realized losses, as with realized gains." *Lucas* v. *American Code Co.*, 280 U.S. 445. In *Doyle* v. *Mitchell Bros. Co.*, 247 U.S. 179, the Court said: " In order to determine whether there has been gain or loss, and the amount of the gain if any, we must withdraw from the gross proceeds an amount sufficient to restore the capital value that existed at the commencement of the period under consideration."

In *Burnet* v. *Logan, supra*, the respondent, with other stockholders of a corporation, sold their stock for a cash consideration and an agreement of the buyer to pay the additional amount of 60 cents per ton for ore removed from a certain mine. Thereafter she received sums purusant to the agreement. The Commissioner treated the obligation of the buyer as having a cash value and regarded the sale as a closed transaction in the year made. The respondent maintained that the sale did not give rise to taxable gain until she had recovered her basis for the stock. In holding for the respondent, the Supreme Court said:

The 1916 transaction was a sale of stock—not an exchange of property. We are not dealing with royalties or deductions from gross income because of depletion of mining property. Nor does the situation demand that an effort be made to place according to the best available data some approximate value upon the contract for future payments. This probably was necessary in order to assess the mother's estate. As annual payments on account of extracted ore come in, they can be readily apportioned first as return of capital and later as profit. . The liability for income tax ultimately can be fairly determined without resort to mere estimates, assumptions, and speculation. When the profit, if any, is actually realized, the taxpayer will be required to respond. The consideration for the sale was $2,200,000 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty. The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one. Respondent might never recoup her capital investment from payments only conditionally promised. Prior to 1921, all receipts from the sale of her shares amounted to less than their value on March 1, 1913. She properly demanded the return of her capital investment before assessment of any taxable profit based on conjecture.

As a condition precedent to the entry of awards in his favor by the Commission, the petitioner waived whatever right he had to proceed further against his German debtors, except through liens based upon possession prior to October 6, 1917, of assets of the debtors within the United States, or property seized under the Trading with the Enemy Act of October 6, 1917. On May 15, 1923, the German Government accepted primary liability for all claims and debts within the jurisdiction of the Commission. Accordingly, the awards made in favor of the petitioner were made obligations of the Government of Germany to the United States for the benefit of the petitioner.

Until the passage of the Settlement of War Claims Act of 1928 on March 10, 1928, no provision was made for payment of the awards. Section 4 (a) of the act created a special deposit account in the Treasury Department and directed the deposit therein of:

1. All sums invested or transferred by the Alien Property Custodian, under the provisions of section 25 of the Trading with the Enemy Act, as amended;

2. Amounts, not exceeding $100,000,000, appropriated in respect to awards of the War Claims Arbiter;

3. Money paid by Germany on account of claims of the Commission.

Subsections 2 (b), (c), and (d) read as follows:

(b) The Secretary of the Treasury is authorized and directed to pay an amount equal to the principal of each award so certified plus the interest thereon, in accordance with the award, accruing before January 1, 1928.

(c) The Secretary of the Treasury is authorized and directed to pay annually (as nearly as may be) simple interest, at the rate of 5 per centum per annum, upon the amounts payable under subsection (b) and remaining unpaid, beginning January 1, 1928, until paid.

(d) The payments authorized by subsection (b) or (c) shall be made in accordance with such regulations as the Secretary of the Treasury may prescribe, but only out of the German special deposit account created by section 4, within the limitations hereinafter prescribed, and in the order of priority provided in subsection (c) of section 4.

Section 4 (c) (1), (2), and (3) of the act provides for the payment of administrative expenses, awards on account of death or personal injury, and awards of less than $100,000, as first, second, and third in order of priority. The provisions relating to the classes of awards next in order of priority, and pursuant to which the payments were made to the petitioner in September 1928, read as follows:

(4) To pay the amount of $100,000 in respect of each payment authorized by subsection (b) of section 2 (relating to awards of the Mixed Claims Commission), if the amount of such authorized payment is in excess of $100,000 and is not payable in full under paragraph (2) of this subsection. No person shall be paid under this paragraph and paragraph (3) an amount in excess of $100,000 (exclusive of interest beginning January 1, 1928), irrespective of the number of awards made on behalf of such person.

(5) To make additional payments authorized by subsection (b) of section 2 (relating to awards of the Mixed Claims Commission), in such amounts as

will make the aggregate payments (authorized by such subsection) under this paragraph and paragraphs (2), (3), and (4) of this subsection equal to 80 per centum of the aggregate amount of all payments authorized by subsection (b) of section 2. Payments under this paragraph shall be prorated on the basis of the amount of the respective payments authorized by subsection (b) of section 2 and remaining unpaid. Pending the completion of the work of the Mixed Claims Commission, the Secretary of the Treasury is authorized to pay such installments of the payments authorized by this paragraph as he determines to be consistent with prompt payment under this paragraph to all persons on behalf of whom claims have been presented to the Commission.

The final two items on the list of priorities, applicable to the petitioner, relate, respectively, to (1) interest due on the unpaid portion of the amount due January 1, 1928, on awards of the Commission, and (2) certain amounts invested by the Alien Property Custodian and the balances due on awards of the War Claims Arbiter and Commission, payable on a pro rata basis.

At the close of 1928 about $900,000 principal and interest was still due the petitioner under the awards stated as of January 1, 1928. Of this balance $576,000 in round numbers was paid during the next three years. On September 30, 1932, when the total amount payable from the special deposit account was around $110,000,000, there was due claimants of petitioner's class about $53,000,000. To meet this obligation the account had a balance on September 30, 1932, of about $5,000,000 and was entitled to be credited with approximately $22,000,000 (but might not exceed $15,000,000) from the Alien Property Custodian, and 40,800,000 reichsmarks payable annually from Germany until 1981 under a debt agreement of June 23, 1930.

Restrictions in the Settlement of War Claims Act against their assignment robs the awards of any market value. The United States disclaimed liability for payment of the awards, and the rights under the awards were held to have been assigned to the United States, to be enforced by it against Germany. Section (2) (h).

Under present arrangements for payment of awards of the Commission, whether the petitioner ever receives the balance due him depends entirely upon the amount of funds received for deposit in the special deposit account, and these receipts in turn depend to a large extent upon not only the ability and willingness of Germany to pay, as agreed, but the course of conduct of the United States in case Germany defaults under the debt agreement. It has been estimated that all of the awards of the Commission will not be paid before 1955. Senate Report No. 273, 70th Cong., 1st sess., Committee on Finance, Settlement of War Claims Bill of 1928, p. 37. The debt agreement of June 23, 1930, extends this time to 1981. Thus, on the basis of existing arrangements for the payment of the awards, there is no prospect of final liquidation of petitioner's awards prior

to 1981. The history of debts against Germany growing out of the war, commencing with the Treaty of Versailles and continuing through the so-called Hoover moratorium, is one of promises, lack of capacity to pay, failure to pay, moratoriums, postponements, revision of obligations, etc. If the future is judged by this series of events it is exceedingly doubtful whether the awards ever will be paid in full.

It is apparent that there is not only a lack of certainty of future payments, but it is highly probable that the petitioner will never receive a substantial part of what is still due him. Under the circumstances, following the rule announced in *Burnet* v. *Logan, supra,* we hold that the petitioner is entitled to recover his cost or other basis for each award before being called upon to pay a tax on sums received under the awards.

The parties have stipulated the petitioner's cost or other basis, if any, for items of each award. The aggregate capital investment to be recovered is about $1,125,000, which is more than the amount of the awards, and the amount of the payments received by the petitioner in 1928. The payments received in the taxable year should be allocated to the several awards in the ratio that the amount of each award, stated as of January 1, 1928, bears to the total of all the awards, plus interest to that date. All of the amount thus applied to awards for which there is no basis constitutes taxable income, and as to the awards for which there is a cost or other basis to recover, only the excess over the petitioner's basis is taxable. As we understand the facts, there will be no income to tax in 1928 under the awards having a capital investment to recover. Proper adjustments should be made for the amount received under award No. 7293 for the account of clients of Speyer & Co. This distribution of the payments will be reflected in the computation to be filed under Rule 50.

## II.

Under the second issue the petitioner is claiming as a loss an amount equal to the difference between his basis for the several awards and the principal amount of the awards. The discrepancy between the figures is due to the fact that the items comprising the awards were acquired with German marks of a value of about 23 cents and the awards of the Commission were, in practically every case, based upon a mark value of 16 cents.

The petitioner insists that the enactment of the Settlement of War Claims Act in 1928 " was the culminating event of the long series of events involving the bank accounts which brought the transaction to a close." The respondent, on the other hand, contends that the loss occurred in 1918, or, in the alternative, in 1925, 1926, and 1927, when the several awards were made by the Commission.

In *United States* v. *White Dental Mfg. Co.*, 274 U.S. 398, involving the deductibility in 1918 of a loss on the seizure of property by the German Government, the Court remarked that the transaction which evidenced the loss was the act of seizure of the assets. In a later case, *Lucas* v. *American Code Co.*, *supra*, the Court, after stating that generally the law is concerned only with realized losses, as with realized gains, said:

* * * Exception is made, however, in the case of losses which are so reasonably certain in fact and ascertainable in amount as to justify their deduction, in certain circumstances, before they are absolutely realized * * * The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test. * * *

The petitioner argues that there was no loss sustained by reason of confiscation or seizure of the accounts during the war. With the view of establishing such a fact, he introduced a witness as an expert on German law and decrees affecting the accounts. His testimony is, in effect, that there was no seizure or administration of the property at any time by the German Government. The orders and decrees from which he reached such a conclusion are in evidence, and we are not bound to accept the witness' interpretation of the various orders and decrees affecting the property rights of the petitioner in the accounts. *Havana Electric Ry., Light & Power Co.*, 29 B.T.A. 1151. A proper consideration of the question does not call for a determination of whether the accounts were actually seized or administered by Germany.

By a decree of September 30, 1914, the German Government made it unlawful to make payments to Great Britain and other countries " whether in cash or by means of bills or cheques or by transfer or in any other manner whatsoever, or to remove or transfer money or securities directly or indirectly to the aforementioned countries." A decree of October 7, 1915, prohibited property situated in Germany of nationals of enemy states, or claims appertaining thereto, from being sold, transferred, or charged without consent of the Custodian of Enemy Property. The same decree made it unlawful " to remove abroad, either directly or indirectly, property belonging to nationals of enemy States, in particular securities and money, without the authority of the Imperial Chancellor * * *." These provisions of the decree were made applicable to the United States and property of its citizens by a decree issued August 9, 1917, and an order of the Imperial Chancellor promulgated November 10, 1917. A decree of October 10, 1915, required persons managing or having the custody of property belonging, or owing money to, nationals of enemy states to make notification thereof to the proper German authority. Another decree, issued April 19, 1917, authorized the Custodian of Enemy Property to " take under his administra-

tion the property in Germany of enemies" and provided for the payment to the custodian of interest as from April 1, 1917, on money claims of citizens of enemy countries, " even if the Custodian has not taken the claim under his jurisdiction."

In 1918 some of the banks and bankers in Germany having funds of Speyer & Co. notified the German custodian of the deposits being held by them to the credit of Speyer & Co. No part of such credits or interest thereon was paid to or for the account of the German custodian. In March 1918 the Custodian of Enemy Property, pursuant to the request of the.German partnership, released it " for the time being " from accounting for interest on the amounts owing the petitioner and Speyer & Co., on the basis of the German partnership's contention that the amounts claimed by it exceeded the credits owing to the petitioner and Speyer & Co. In March 1922 the banks and bankers were notified by the German custodian that the extraordinary war measures adopted respecting the deposits had been annulled in so far as the measures affected citizens of the United States.

It is apparent from these quotations from the war measures enacted by Germany respecting property within its borders belonging to citizens of enemy countries that creditors such as the petitioner had few property rights in the accounts which they could exercise with any great degree of freedom. As we interpret the various German decrees and orders, aided by the testimony, transfer of ownership under all circumstances was subject to the approval of the Custodian of Enemy Property. The effect was to make any attempt to sell or assign conditional upon the final approval of the custodian. Such interference on the part of the German Government very seriously impaired the property rights of the petitioner and Speyer & Co. The restrictions, we think, were such as to amount, from a practical viewpoint, to an absolute seizure. The interference with the owners' property rights would have justified a deduction of any loss sustained in a year long before 1928.

In April and October 1917 the German partnership had on deposit with Speyer & Co. a large amount of cash and securities. During October 1917 Speyer & Co. debited the account with several matured installments of loan accounts with the German partnership. The debits were sufficient in amount to convert the credit balance in favor of the German partnership into a debit balance in favor of Speyer & Co. The Alien Property Custodian, who was duly advised of the account following the passage of the Trading with the Enemy Act on October 6, 1917, permitted Speyer & Co. to retain securities of a market value of $550,000 as security for the then balance of " in excess of $450,000 " in the account. Thereafter entries were made in the account for other installments of the loan accounts, interest, and claims of clients of the German partnership, but on

February 11, 1929, it still had a balance of $655,980.73 in favor of Speyer & Co., and Speyer & Co. held as a lien securities of the market value of $116,911. At all times prior to May 1926 the market value of the securities was not less than the debit balance in the account. The security thus held by Speyer & Co. was in no wise released by the waivers it gave the Commission in connection with claims filed with it, and was ample to satisfy a large part of the sum due from the German partnership under the loan accounts.

If we were to assume that the various war measures adopted by Germany respecting the status of the deposits and accounts did not give rise to a deductible loss at that time, the losses occurred in 1925, 1926, and 1927, when the awards of the Commission were entered. These awards fixed the maximum amounts recoverable through the Commission on all the claims and definitely fixed the loss on the awards for which the petitioner had no lien. The Settlement of War Claims Act only provided a means of realizing something on the awards and did not in any way affect the question with which we are concerned. On this issue we sustain the respondent.

## III.

In 1928 the petitioner paid to counsel for services rendered in preparing and filing claims with the Commission the sum of $48,-591.24, an amount equal to 10 percent of the payments made on the awards in that year. No part of the amount was allowed as a deduction in the determination of the deficiency. The petitioner concedes that the amount of the deduction should be reduced to $46,557.77 for a portion of the expense borne by his clients. The respondent concedes that $18,153.55 of the amount paid is deductible as an ordinary and necessary business expense in case we should hold, as contended by him, that $181,535.35 of the payments received in 1928 on the awards is taxable income.

The respondent argues that in so far as the fees were expended for the return of capital, they are not deductible, citing *Murphy Oil Co.* v. *Burnet*, 55 Fed. (2d) 17; affirmed on other points, 287 U.S. 299, and says that the case of *Kornhauser* v. *United States*, 276 U.S. 145, applies to the portion of the expense relating to income. No contention is being made that the expense was not incurred in a trade or business of the petitioner.

The attorney fees in controversy in *Murphy Oil Co.* v. *Burnet*, *supra*, were expended in defending title to oil property. Here the fees were expended in an effort to recover, by the procedure set up by the Commission, bank deposits and other accounts created in the conduct of the petitioner's business. They are like charges made for collecting accounts receivable, some part of which may represent

cost of goods sold. We hold that $46,557.77 of the amount paid is deductible from gross income as an ordinary and necessary business expense. *Kornhauser* v. *United States, supra.*

## IV.

In 1917, 1918, 1919, and 1920 the German partnership, without petitioner's consent or knowledge, paid to Germany, and charged to the personal account of the petitioner on its books, amounts aggregating $59,805.31 for income taxes assessed against the petitioner on his German income for 1916. The account had a debit balance at the times the several payments were charged to the account. The petitioner is claiming the amounts so paid as a credit against his 1928 income tax. See section 131, Revenue Act of 1928.

In the claim he filed in 1922 with the Commission the petitioner asked for an award for the mark balance in his capital account on December 31, 1916, with the German partnership, plus interest thereon to April 6, 1917. The Commission on February 3, 1926, entered an award for that amount, stated in dollars, less the amount owing by the petitioner to the German partnership, which included the aforementioned sum of $59,805.31. The petitioner says that this balancing of the accounts with the German partnership had the effect of forcing him to pay the taxes in 1928. We can not agree with such reasoning.

As a condition precedent to the entry of the award the petitioner waived whatever rights he had to proceed further against the German partnership involved in the claim, and he knew not later than the time he received notice of the award that his debts to the partnership had been used as an offset against his claim. There is no denial of acceptance of the award prior to 1928, as entered, and it does not appear that the petitioner ever filed a protest with the Commission on account of the offset it made or with the German partnership on account of the unauthorized payments it made. Nothing appears to have occurred in 1928 having any relation to payment of the tax in that year. Under the circumstances, we think that the petitioner acquiesced in the payment prior to 1928. This assent on the part of the petitioner constitutes payment. On this issue we sustain the respondent.

## V.

In accordance with the request made in the respondent's answer to the amended petition, the amount deductible from gross income for contributions will be redetermined under Rule 50 on the basis of petitioner's net income as reflected therein.

Reviewed by the Board.

*Decision will be entered under Rule 50.*