**MAYER v. UNITED STATES.**

No. 47980.

United States Court of Claims.

Decided April 7, 1953.

252

Monte Appel, Washington, D. C. (Blair Körner, Doyle & Appel, Washington, D. C., on the brief), for the plaintiff.

Joseph H. Sheppard, Washington, D. C., Charles S. Lyons, Acting Asst. Atty. Gen. (Andrew D. Sharpe, Washington, D. C., on the brief), for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge, delivered the opinion of the court.

The plaintiff, a naturalized American citizen born in Germany, seeks to recover income tax in the amount of $8,386.23 alleged to have been overpaid for 1941 on the ground that he was entitled to deduct from his gross income for that year, either as a war loss or as a casualty loss, the value of certain personal property which he claims he owned, but which remained in Germany and Czechoslovakia when he came to the United States in 1939. This property consisted of house furnishings in storage in Czechoslovakia, stocks and bonds held by banks in Czechoslovakia and Germany, and deposits of money in banks in both of those countries. The plaintiff never recovered any of this property.

The house furnishings were accumulated by the plaintiff and his wife over a period of many years beginning with their marriage in 1911. From 1930 to 1935 the plaintiff lived in Aussig, Czechoslovakia, in a large house made available to him by United Chemical and Metallurgical Works, hereinafter referred to as United Chemical, a large chemical company having many factories throughout Europe. As the president of this company, it had been part of plaintiff's duties to receive prominent visitors and to entertain in his home on a lavish scale. For that purpose and for his own comfort and pleasure, the plaintiff's home was luxuriously furnished with expensive antique and modern furniture, all in keeping with refined living and a cultural background. When the United Chemical moved its headquarters from Aussig to Prague on December 31, 1935, the plaintiff resigned his position as head of the company and went to Zurich, Switzerland, in the early part of 1936. However, under a special contract with the company he continued to serve as an advisor and do special work. This necessitated his staying in Aussig at least four months a year where a smaller house was made available to him, into which he moved part of his furnishings. The remainder of his furnishings were moved to Zurich. In the middle of 1938 the plaintiff made arrangements with Radler and Assmann, a storage and moving firm in Aussig, to move the furnishings of the smaller house to Switzerland. However, because of the prevailing conditions, including Hitler's attitude and directives, the storage firm was unable to move the furnishings. Shortly after the Germans entered Aussig, in October 1938, German officials required the furniture to be moved from the smaller house. After being first placed in an apartment belonging to United Chemical, the furnishings were, in the early part of 1939, placed in a warehouse of Radler and Assmann. Although the plaintiff during January and February 1939 contacted the storage firm by mail and phone, all efforts to have the furnishings shipped to Switzerland or the United States were unsuccessful. The plaintiff was last in Aussig on September 8, 1938, and did not see any of these furnishings after that date. In 1946, in answer to his inquiry, Radler and Assmann informed him that the stored objects had been taken upon order of the Gestapo in 1943 and sold at public auction.

During 1936 and 1937 the plaintiff had purchased Hungarian gold bonds and shares of I. G. Farben stock. He did not at any time take physical possession of these se-

curities, but left the former with the Bohemian Union Bank in Prague and the latter with the same bank in Berlin. The Hungarian gold bonds were sold in 1942 at the direction of the German Gestapo and the proceeds were credited to the plaintiff's account. A stock dividend on the I. G. Farben stock was credited to the plaintiff's account in 1942. He has never received the proceeds from the sale of the Hungarian gold bonds, nor has he ever received the I. G. Farben stock or anything of value therefor.

On November 14, 1941, the plaintiff had on deposit with the Dresden Bank, Stuttgart branch, Germany, RM 490. While this amount was never withdrawn by the plaintiff, the account had a balance of zero on October 4, 1943.

During his association with United Chemical, the plaintiff had a personal drawing account with the company in which the company credited to him such items as salary, director's fees and other amounts. While it was shown that there was a balance in this account of 244,833 crowns and 63 hellers (Czechoslovakian currency) during November and December 1941, the plaintiff never withdrew any of that amount. This as well as the other accounts mentioned above were labeled by the banks as "preferred blocked credit," "blocked account," or "blocked credit." This meant that the owner could not remove the funds from the country without obtaining a permit from the German government, and such permit was unobtainable by plaintiff.

During 1937 and 1938 plaintiff was a director of a subsidiary of United Chemical at a salary of 10,000 Czechoslovakian crowns per year. He never received any of the amounts due him for either of those years. In 1938 when he was spending the greater part of his time in Switzerland, the plaintiff made application for the release of his salary for 1937, but the Czech National Bank refused and asked for proof as to the plaintiff's citizenship and how long he had been permanently residing in Switzerland.

In his claim for refund filed with the Commissioner of Internal Revenue on September 23, 1942, the plaintiff claimed the deduction here claimed, under the terms of section 127 of the Internal Revenue Code, 26 U.S.C. § 127, which provides in part as follows:

"§ 127. War losses—(a) Cases in which loss deemed sustained, and time deemed sustained.

"For the purposes of this chapter—

* * *

"(2) Property in enemy countries. Property within any country at war with the United States, or within an area under the control of any such country on the date war with such country was declared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States."

War with Germany was declared on December 11, 1941, and under the terms of this section the plaintiff contends that he is entitled to a deduction for the year 1941 in an amount equal to the value of his property which remained in Germany and Czechoslovakia. Defendant contends that the plaintiff did not own the property on the date of our declaration of war on Germany or if he did that he has failed to prove the value thereof as of that date. Plaintiff's claim for refund filed with the Commissioner of Internal Revenue was based entirely on this section.

■ Under this section the taxpayer as a prerequisite to claiming a loss must show ownership of the property involved on the date of declaration of war. Here that date is December 11, 1941. The Treasury Regulation 26 CFR 29.127(a)–1, chap. 1, p. 494 (1949 Ed.), issued under this section, provides in part as follows:

"* * * for the taxpayer to claim a loss with respect to such property he must own such property or an interest therein at such time. If before such time, the property was destroyed or confiscated, Section 127 is not applicable with respect to such property. For example, a taxpayer owned property in an enemy country before war was declared on such enemy by the U. S., and such property was confis-

cated by the enemy before the date war was declared. The seizure was not in the course of military or naval activities. The taxpayer may not claim a war loss with respect to such property under section 127."

■ The question is one as to whether on December 11, 1941, the plaintiff owned the property here involved within the meaning of Section 127. Adler v. Commissioner, 8 T.C. 726. A tax deduction is a matter of legislative grant and to be entitled thereto the taxpayer must bring himself clearly within the provisions allowing the deduction.

On November 25, 1941, the German Government under the authority of paragraph three of the Reich Citizen Law of September 15, 1935 (Reich Law Gazette Part I), issued its "Eleventh Executive Order" entitled "First Decree Relating to the Reich Citizen Law of November 25, 1941," which provided in part as follows:

"*Paragraph 1.* No Jew who has his regular residence abroad can be a German national. Regular residence abroad exists when a Jew resides abroad under circumstances permitting of the recognition that he is staying there not temporarily.

"*Paragraph 2.* A Jew shall lose German nationality: (a) If at the time this decree becomes effective he has his regular residence abroad, with the becoming effective of this decree; * *.

"*Paragraph 3.* (1) The property of the Jew who loses German nationality by virtue of this decree shall with the loss of nationality become forfeit to the Reich. * * *

"*Paragraph 12.* The decree applies also to the Protectorate of Bohemia and Moravia and in the annexed Eastern Territories."

The plaintiff is of Jewish descent and the property here involved was located in Germany and in that part of Czechoslovakia known as Bohemia. He entered the United States as a German national in 1939 with the intention of residing here permanently, which he has done. In his testimony plaintiff stated that he lost his German nationality under the November 25, 1941, decree.

The November 25, 1941, decree was one of several directed at Germans of Jewish descent during the late thirties. (See Findings 25 and 26.) During this period it had become exceedingly difficult for them to deal with their property because of these decrees. In 1938 the plaintiff, while then residing in Switzerland, was unsuccessful in his efforts to remove the house furnishings from Czechoslovakia because of the directives of the Hitler régime. He met with the same result during that same year in an effort to remove money from the Czech National Bank in Czechoslovakia.

■ In the light of this decree and its applicability to those who found themselves in the situation in which the plaintiff here found himself, can it be said that the plaintiff retained a sufficient interest in the property involved so that on December 11, 1941, he could sustain a loss under the provisions of section 127? The defendant contends that he did not. We agree with that contention. The test which must be adopted in determining "sufficient interest" is a practical one. This identical question as to the nature of the test under section 127 was before the court in Rozenfeld v. Commissioner, 2 Cir., 181 F.2d 388, 390, where the court stated:

"* * * We understand from this that the test is a practical one, and does not depend upon an absolute forfeiture of all legal right. * * * The relevant consideration, as we understand the Supreme Court [referring to United States v. S. S. White Dental Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120], is not the legal consequences of the seizure, but how completely the owner is dispossessed: i. e., the remoteness of any recovery of the property or its proceeds."

■ In the White Dental case, supra, a deduction for the loss of property sequestered by the German government in 1917 was allowed even though it appeared that legal title remained with the taxpayer, since the possibility of his ever regaining the property was purely conjectural because of

the hazards and uncertainties of war. We believe this to be the correct test. In applying this test to the instant case, we hold that the decree of November 25, 1941, so voided any control which the plaintiff might have exercised over his property that on December 11, 1941, he had nothing to lose with respect to the property here involved which had not already been lost.

While his claim for refund filed with the Commissioner of Internal Revenue was based solely on the grounds above discussed, the plaintiff in his suit here has included an alternative ground for recovery under section 23(e)(3) of Title 26, U.S.C. (1946 Ed.). This section provides for the deduction of losses "of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft." Plaintiff asserts that if the decree of November 25, 1941, resulted in the loss of the property involved here then he is still entitled to a deduction for the year 1941 under the terms of this section. Defendant contends (1) that having failed to assert this basis for recovery in his claim for refund filed with the Commissioner, the plaintiff may not rely on this section in his suit here, and (2) that even if consideration is given here to his claim under section 23(e), the nature of the loss sustained is not one which comes within the meaning of "or other casualty" as used in this section.

Section 322 of the Internal Revenue Code, 26 U.S.C. (1946 Ed.) § 322, sets forth the provisions which govern the filing for a tax refund. The Treasury Regulation 26 CFR 29.322–3(b), chap. 1, p. 630 (1949 Ed.), issued thereunder, reads in part as follows:

"* * * The claim must set forth in detail and under oath each ground upon which a refund is claimed, and facts sufficient to apprise the Commissioner *of the basis thereof.*" [Italics supplied.]

This or similar worded regulations have long been in existence under section 322, and the courts, in the desire to further settlement within the Treasury Department whenever possible, have ruled that such statutory prerequisites must first be met before resort to court action may be had.

The question involved here was before the Court in Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13, 60 S.Ct. 371, 373, 84 L.Ed. 542. In the Real Estate case the taxpayer had filed his claim with the Commissioner based solely on section 23(k) which provided for a deduction for obsolescence. The property involved there was a title plant which the taxpayer had ceased to use during the taxable year. In the suit which followed the Commissioner's rejection of the refund, the taxpayer included an alternative ground of recovery under section 23(f) which allows a corporation to deduct "losses sustained during the taxable year and not compensated for by insurance or otherwise." The Court after having decided that no recovery could be had under section 23(k) went on to state concerning recovery under section 23(f):

"* * * Whether petitioner has satisfied those requirements we do not decide for its claim for refund was based exclusively and solely on the ground that it was entitled to an allowance for obsolescence. Hence, in absence of a waiver by the government * * * or a proper amendment, petitioner is precluded in this suit from resting its claim on another ground."

This court in Hopkins v. United States, 82 F.Supp. 1015, 1022, 113 Ct.Cl. 217, 229, relied on the Real Estate case in rejecting the taxpayer's effort to assert for the first time in this court a basis for recovery not contained in his claim for refund filed with the Commissioner. There we stated:

"The first ground for recovery, asserted herein, was not made the basis of either the refund claim filed in May 1937, or the one filed in April 1939, and cannot, therefore, be allowed even if there had been such a transaction as would come within the capital gains provision."

See also on this point Stewart v. United States, 50 F.Supp. 224, 99 Ct.Cl. 585.

We hold, therefore, that having failed to assert section 23(e)(3) as a basis for recovery in his claim filed with the Commissioner, the plaintiff may not now

rely on such section in his suit here. Hence, we find it unnecessary to decide whether the loss sustained by the plaintiff comes within the provisions of this section. The petition is therefore dismissed.

It is so ordered.

JONES, C. J., and HOWELL, MADDEN and WHITAKER, JJ., concur.