Hans WYMAN, Stella Wyman, Charles A. Wyman, Henry W. Wyman, Ruth Lillian Russell, Ralph M. Wyman, Frederick Wyman, Ella Wyman, Frank H. Wyman, Thomas G. Wyman

v.

UNITED STATES.

Hans WYMAN, Charles A. Wyman, Henry W. Wyman, Ruth Lillian Russell, Ralph M. Wyman, Lotte Wyman, Frederick Wyman, Frank H. Wyman, Thomas G. Wyman

v.

UNITED STATES.

Nos. 48772, 49573.

United States Court of Claims.

Oct. 8, 1958.

Richard P. Jackson, New York City, Alexander & Green and James W. Misslbeck, New York City, on the briefs, for plaintiffs.

David R. Frazer, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., James P. Garland, Washington, D. C., on the brief, for defendant.

LITTLETON, Judge.

Plaintiffs bring suit for refund of alleged overpayments of their income taxes for the years 1943, 1944, and 1945. They claim that they should have been, but were not, permitted to take deductions for losses of certain property in Czechoslovakia, which they say resulted from actual, physical confiscations by the German Government in those years.[1]

Plaintiffs, Hans Wyman and Frederick Wyman (deceased) were brothers, and the other plaintiffs are their children, except Ella Wyman who is Frederick's widow. They are natives of Czechoslovakia who emigrated to the United States in 1941, and became, in due time, naturalized American citizens. They were Jews and were forced to leave Czechoslovakia because of Nazi pressures upon Jewish persons. Prior to their flight, the Wyman family owned coal mines located principally in the Sudetenland area of Czechoslovakia, and the family firm which had been founded around 1870 acted as sales agent for the products of its own and for various other mines. By the time of Hitler's rise to power in Germany, plaintiffs Hans and Frederick had become equal partners in this family business. In July 1937 they made a gift to their children of all the stock in the Brucher Coal Company, which was owned by the partnership.

In March 1938 Austria was invaded by the Germans. The brothers then agreed that Frederick would leave Czechoslovakia and go to England to administer the foreign assets from a safe vantage point. Frederick in April 1938 went to England and took the other members of the family with him, leaving Hans behind to administer the interior assets. Frederick was not able to take any property out of the country with him. To effectuate their plan of insulating the foreign assets from any pressures which might be brought against Hans and against the interior assets, the partnership was dissolved of record and the interior assets were put in Hans' name and the foreign assets were put in Frederick's name, but each partner remained the equitable owner of the assets relinquished.

Just before the Germans occupied the Sudetenland in the fall of 1938, Hans transferred the seat of the family business from Aussig, in the Sudetenland, to Prague. The Sudetenland became a part of Germany as a result of the Munich Pact of September 30, 1938. The rest of Czechoslovakia remained as an independent sovereign nation until March 15, 1939, at which time Hitler occupied the rest of the country and created Slovakia, a German puppet state, and the Protectorate of Bohemia and Moravia. The Protectorate of Bohemia and Moravia was administered by a German State Ministry, which maintained a property office or Vermogensamt, the cashier's office of which was known as the Amtskasse. When the Germans confiscated property, the procedure was to

---

[1]. The property which the taxpayers here claim as losses consisted of shares of stock in several companies, Government and other bonds, cash on deposit in the firm name and saving bank accounts standing in the name of individual taxpayers.

liquidate the property and transfer the cash proceeds to the Amtskasse. Various savings accounts and bank accounts and certain stocks and bonds belonging to the plaintiffs herein were so liquidated and the proceeds thereof transferred to the Amtskasse at various times in 1943, 1944, and 1945.

Because of the increasing German pressure, Hans fled to England in November 1939, and he too was unable to take any property with him. Hans left the family business in the hands of two trusted employees, Dr. Otto Wondreys and Miss Ann Tschinkel, but other employees of the Wyman firm later that same year seized control of the business, with the permission of the German authorities, and operated the mines, turning over a portion of the profits to the German Government.

During the period of Nazi occupation, the firm business was continued under the administration of Nazi appointed administrators, first Dr. Ernest Pauler, appointed February 13, 1940, and later August Urban, who replaced Pauler on October 14, 1940. The power of these administrators was described in the Offcial Register of Commerce of Prague as follows:

"As Administrator of the firm who represents the firm independently and signs in such a way that he signs with his own hand under the name of the firm with the designation 'Administrator' or 'Trustee'."

After the war Urban, in a letter to Frederick Wyman, explained his function as follows:

" * * * in view of your absence, I had in this capacity to administer your property with the care of a good businessman up to the time of its transfer into the property of the Reich."

After the Munich Pact was signed in September 1938, the German Government promulgated several decrees concerning property owned by Jewish persons, and providing for loss of citizenship of Jewish persons moving their residence abroad and providing for the contemporaneous confiscation or forfeiture of the property of persons thus losing their citizenship. These decrees are quoted in findings 14–16 and 20–21.

After the Sudetenland became a part of Germany as a result of the Munich Pact, but before all Czechoslovakia was occupied, the Germany Government issued the decree of December 3, 1938, concerning the use of Jewish property and which provided in Paragraph 22:

"So far as the provisions of this Decree cannot be applied directly to the Sudeten German Territory, they are to be applied according to their spirit."

The decree of June 21, 1939, concerned Jewish property in Bohemia and Moravia, and the decree of October 3, 1939, provided for loss of citizenship of "citizens of the Protectorate [of Bohemia and Moravia] who did not obey an order to return" and provided for seizure and confiscation of the property of such persons.

Under the authority of the decree of December 3, 1938, Hans and Frederick Wyman were on October 18, 1939, ordered to sell the shares which they owned in the Brucher Coal Company, which, unknown to the German authorities, had previously been given to the Wyman children. This order advised the owners that if a written sales contract was not submitted by them within two weeks, one Dr. Rittstieg was to be appointed as trustee for the sale of those shares. Later Rittstieg, as trustee, entered into a contract of sale of all the stock of the coal company, and the sale was approved by the appropriate German authorities on September 16, 1940. Some portion of the proceeds of that sale were placed in an account in the firm name, where it remained until actual physical confiscations of plaintiffs' bank accounts and transfer of the cash to the Amtskasse began some time after December 1942.

On November 25, 1941, the German Government issued its Eleventh Execu-

tive Order which provided for loss of German citizenship of a Jew who had his ordinary residence abroad and provided that the "property of a Jew who loses his German citizenship by the application of this order escheats to the Reich contemporaneously with the loss of citizenship." Paragraph 12 of that Order stated:

"This order extends to the Protectorate of Bohemia and Moravia and the annexed territories in the East."

On November 2, 1942, another decree was issued by the German Government, which provided for loss of Protectorate citizenship of a Jew who had his ordinary residence abroad, such loss to be effective as of the date of the decree. Paragraph 3 of that decree said:

"(1) The property of a Jew who loses his Protectorate citizenship by application of this Decree escheats to the Reich contemporaneously with the loss of the citizenship of the Protectorate. The property of Jews who on the effective date of this Decree are stateless and whose last previous citizenship was of the Protectorate or of Czechoslovakia also escheats to the Reich if they have or establish their ordinary residence abroad."

After the Wymans came to the United States in 1941, they had no further communication with Dr. Wondreys or Miss Tschinkel, whom Hans had left in charge of the firm business, and during the years 1942 to 1945, plaintiffs had no knowledge of the status of their properties in Czechoslovakia.

Plaintiffs apparently want to disregard section 127, the war losses provision, of the Internal Revenue Code of 1939, and claim loss deductions under either section 23(e) (3) or under section 117(j), 26 U.S.C.A. §§ 23(e) (3), 117(j), 127. Plaintiffs' principal argument relates to the choice of which of the many events recited above should be selected as the event or events constituting the "loss" for Federal income tax purposes. The plaintiffs urge the court to disregard the promulgation of the Nazi confiscatory decrees, the actual loss of control over their property after their flight from the country, and the declaration of war upon Germany which under section 127 would create a presumption as to the fact of and the time of loss. Plaintiffs urge the court to seize upon, instead, the date on which the Nazi officials actually converted certain portions of their property into cash and transferred that cash into the Amtskasse and to say that only this final event which permanently deprived them of legal title to their property constituted the "loss" within the meaning of the Internal Revenue Code. For reasons which will be discussed below, we are of the opinion that the losses occurred prior to these final transfers of cash into the Amtskasse.[2]

The first point raised by plaintiffs is that the Nazi decrees were void *ab initio* and did not *ipso facto* result in such "confiscation" of their property as would constitute a "loss." Plaintiffs argue, and correctly so, that the "act of state" doctrine as expressed in such cases as Oetjen v. Central Leather Co., 1918, 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726, does not prohibit this court from deciding the question of the legality of these Nazi confiscatory decrees. In support of this contention, plaintiffs cite Bernstein v. N. V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, 2 Cir., 1954, 210 F.2d 375, 376, which held that the court was free to pass on the validity of acts of officials of the German Government in view of the existence of an official executive policy of the United States to "relieve American courts from any

2. Plaintiffs have requested the court to make detailed findings as to the dates of the actual liquidation of their property into cash and the actual transfers of that cash into the Amtskasse, and have submitted documentary evidence in support of such findings. We do not find it necessary to make such additional findings, since we find that the losses, for Federal income tax purposes, occurred prior to those dates.

restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials." This executive policy, however, relates to undoing forced transfers of property and restoring identifiable property which has been transferred under such Nazi decrees. The instant case is not a claim for restitution of such property, and plaintiffs have already recovered their identifiable property which is still in existence. The instant case involves the problem of establishing the fact of a "loss" and the time of that "loss" for Federal income tax purposes. As we will see below, a loss for income tax purposes does not require the loss of legal title, and the legality or illegality of the act causing the loss is obviously immaterial.

Plaintiffs argue that the decree of November 25, 1941, did not apply to them because they were never at any time German citizens, this despite the language of Paragraph 12 quoted above, which plaintiffs regard as applying only to German citizens residing in the Protectorate. However, the language of the decree of November 2, 1942, did cover persons such as these plaintiffs, a fact which plaintiffs concede.[3] But plaintiffs say that even if applicable to them, these decrees are not self-operative and do not effectuate such "confiscations" as would constitute losses.

Plaintiffs' argument that the decrees were not self-operative is without merit. In a case involving the decree of November 25, 1941, this court held that that decree was sufficient in and of itself to constitute a loss of property by a taxpayer. Mayer v. United States, 1953, 111 F. Supp. 251, 126 Ct.Cl. 1. As we have already indicated, plaintiffs urge that the actual liquidation of their property into cash and the transfer of that cash into the Amtskasse are necessary for an effective confiscation and in support of that contention, they point to the various actions taken by the Germans in reference to their property subsequent to the promulgation of the decrees. But the multiplicity of actions taken by the German Government in reference to the property of these plaintiffs subsequent to the promulgation of the confiscatory decrees can be explained by the fact that the Nazi officials always tried to give a semblance of legality to their actions of stripping Jewish persons of their property.[4]

Plaintiffs point to the subsequent recovery of portions of their property as showing that the decrees did not automatically result in a loss of their property. A subsequent recovery of portions of one's property does not negative the existence of a total loss, deductible in an earlier tax year. See United States v. S. S. White Dental Mfg. Co., 1927, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120, which will be discussed more fully later in this opinion.

Plaintiffs claim that they are entitled to a deduction for the confiscations of their property under section 117(j) of the Internal Revenue Code of 1939.[5]

3. If the court found that the loss in the instant case did not occur until the promulgation of the decree of November 2, 1942, it would not aid these plaintiffs who have claimed losses in 1943, 1944, and 1945 and not in 1942.

4. Plaintiffs are in the anomalous position of urging, on the one hand, that the Nazi decrees are a complete nullity and, on the other hand, that the scope of such decrees must be interpreted very strictly and that the legal technicalities of the decrees must be followed scrupulously to effectuate "confiscations" pursuant thereto.

5. Subsection 117(j) (2) reads as follows: "If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, *such gains and losses shall be considered as*

Section 117(j) was added to the Internal Revenue Code by the Revenue Act of 1942, 56 Stat. 798, and was designed to give a capital gain or loss treatment to gains or losses from the sale or exchange of certain depreciable property as defined in that section and for losses upon the compulsory or involuntary conversion of such depreciable property, which losses under prior law had received ordinary gain or loss treatment. See H.Rept. 2333, 77th Cong., 2d Sess., p. 55 and pp. 96–97. Section 117(j) provides for capital loss treatment for losses of certain types of property, as opposed to the ordinary loss treatment accorded casualty losses under section 23(e) (3); that section does not give the answer to the question of whether or not there is a loss, and, if so, when such loss occurred.

Plaintiffs cite the Commissioner's regulations issued to accompany section 127 of the Revenue Act of 1942 and say that the Commissioner therein recognized that "the statute specifically authorized a deduction under either § 117(j) or § 127 for losses arising as a result of the confiscation of property." Those regulations show that once the fact of and the time of loss is established under section 127, that loss will be treated either as an ordinary loss under section 23(e) (3) (nonbusiness casualty losses), or as a capital loss under section 117(j) (losses attributable to the operation of a trade or business), depending upon the nature of the loss involved.[6] This interpretation is supported, by implication at least, by Schwarcz v. Commissioner, 1955, 24 T.C. 733, where the Government urged, without success, that section 127 losses must always be treated as nonbusiness casualty losses under section 23(e) (3) and could never be attributable to the operation of a trade or business.

Plaintiffs seem to place particular reliance upon section 117(j). They dismiss the question of the applicability of section 127 with the statement, at page 14 of their main brief, that this court has, in the Mayer case, cited above, held that "a taxpayer may proceed under either § 23 or § 127." That case, which will be discussed in detail below, merely held that section 127 was not applicable to the facts there before the court.

These arguments advanced by plaintiffs herein do not solve the basic problem before this court, viz., what, under all the facts and circumstances of this case, constitutes the loss and the time of that loss. The test laid down by the Supreme Court in United States v. S. S. White Dental Mfg. Co., 1927, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120, affirming 61 Ct.Cl. 143, and restated by this

*gains and losses from sales or exchanges of capital assets held for more than 6 months.* If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *
"(A) * * *
"(B) Losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion." [Italics supplied.]

6. Regulations 111 § 29.127(a)–1 read as follows:
"Section 127(a) and (e) provides that the property and investments described above shall be treated as being "destroyed or seized" upon the date specified in the applicable subsections. That is,

upon such date the taxpayer is treated as losing his entire interest in such property or investment, and this loss of such property rights is deemed to be sustained by reason of a casualty. The casualty is the destruction or seizure, whichever event the taxpayer claims occurred. *If the property or investment was held for more than six months and was a capital asset or property used in the trade or business of the taxpayer, this loss (and any compensation therefor) is subject to the provisions of section 117(j), relating to gains and losses upon involuntary conversions.* See section 29.-117–7. *Unless such loss is treated under section 117(j), as a loss from the sale or exchange of a capital asset, such loss is deductible as an ordinary loss under the provisions of section 23(f) in the case of a corporation and section 23(e) (3) in the case of an individual.* * * * " [Italics supplied.]

court in Mayer v. United States, supra, is a practical test of loss of control over, and not necessarily loss of title to, one's property. In S. S. White Dental Mfg. Co., the German Government, under its rights as a belligerent power, appointed a sequestrator to take over the property of a German corporation in which the taxpayer owned an interest. The sequestrator managed the business from March 1918 until March 1920, at which time he relinquished possession of the seized assets and business to the German corporation. The taxpayer claimed, and the Supreme Court permitted it to take, a loss deduction for the year 1918 for the entire amount of its investment in the German corporation. In that case the taxpayer was claiming the right to deduct the entire amount of its investment at the time of seizure by the German Government, without considering the possibility of eventual recoupment and, indeed, the fact that part of the property had actually been recovered two years later.

In the Mayer case, plaintiff, who had been born in Germany, fled to the United States in 1939, leaving certain personal property in Czechoslovakia. He lost his German citizenship as a result of the Nazi decree of November 25, 1941, which provided for contemporaneous forfeiture of property of persons thus losing their citizenship. Among the property left behind was certain furniture which was stored in a warehouse until 1943, at which time it was sold at public auction by order of the Gestapo. The proceeds of certain bonds also sold in 1942 at the direction of the Gestapo and of certain stock dividends were placed in an account in taxpayer's name, but he was not permitted to remove the deposits from the country. None of this property was ever recovered by the taxpayer. The taxpayer sought to deduct the loss from his 1941 gross income either as a war loss under section 127 or as an ordinary casualty loss under section 23 of the Internal Revenue Code of 1939. This court held that the taxpayer could not take a war loss deduction under section 127, because the decree of November 25, 1941 had so stripped him of his interest in his property and so voided any control he might have exercised over his property that he no longer had anything to lose on December 11, 1941, the date the United States declared war on Germany and the operative date under section 127. The court found that the loss occurred on November 25, 1941, the date of the decree, but taxpayer was not permitted to claim a casualty loss under section 23(e) for the year 1941 because he had failed to prove the value of the property at the time of the loss.

Unlike the instant case, Mayer did not involve a situation where a taxpayer was claiming that the loss occurred at the time of the ultimate loss of legal title, which in Mayer probably would have been the date on which the furniture was sold and the dates on which the money deposited in the taxpayer's name was finally transferred to German bank accounts. The court, in Mayer, knew when the actual and final loss of legal title occurred, but held that the loss for Federal income tax purposes occurred on the date the confiscatory decree was promulgated.

Plaintiffs herein cite Mayer as holding that sections 127 and 23 are not mutually exclusive, but the court there merely found that section 127, by its express terms, applied only to losses which occurred no earlier than December 7, 1941, and the section, therefore, did not apply to the facts then before the court.

In the Mayer case, this court cited, with approval, the case of Rozenfeld v. Commissioner, 2 Cir., 1950, 181 F.2d 388. The Second Circuit found that section 127 was not applicable because the ribbon factory, which was the subject of the loss claim, had been seized by the German army on September 1, 1939, a date prior to the effective date for section 127. The Second Circuit strongly adopted a "practical test" for determining the happening of the loss. In that case, it was clear that the seizure by the German army was illegal, unlike the legal

seizure involved in S. S. White Dental Mfg. Co., and that the taxpayer retained his title at all times, but he did not have possession and control of the factory from the date of the illegal seizure until January 1945. This loss of control and possession over the property, even though there was no absolute forfeiture of all legal rights in the property, constituted a loss on the date of the seizure, and the taxpayer, on December 11, 1941, no longer had anything to lose under section 127.

In Reiner v. United States, 7 Cir., 1955, 222 F.2d 770, a case not cited by the parties to this suit, the Seventh Circuit apparently did not follow the "practical test." There the court said that the decree of November 25, 1941, deprived the taxpayer of sufficient interest in her house in Vienna so that, on December 11, 1941, she did not have anything to lose within the meaning of section 127. To this extent, the Reiner opinion is consistent with our Mayer decision. However, that court did not find that the loss occurred on November 25, 1941, the date of the Nazi decree, but went on to find that that decree was void *ab initio* so that the taxpayer "owned" the property in 1944 at the time of the bombing and could take a casualty loss deduction under section 23(e) (3) for the year 1944. The opinion does not explain why, if the decree was void *ab initio* so that the taxpayer owned the property in 1944, she did not own it on December 11, 1941, for the purposes of section 127. It has been suggested, with disapproval, that the explanation rests upon a distinction between the degree of ownership required for section 23 and that required for section 127. See 104

U.Pa.L.Rev. 117 (October 1955).[7] The Reiner case, on the question of what constitutes a "loss," held that the bombing in 1944 constituted a casualty loss within the meaning of "other casualty" in section 23(e) (3), but to arrive at that decision, the court there had to disregard many earlier events, which other courts have regarded as constituting "losses."

A "loss" for purposes of section 127 appears to be defined by statute. Subsection 127(a) (2), here pertinent, says that owning property situated in a country against whom the United States declares war establishes the fact of a loss, and the time of such loss is set at the date on which the United States declares the existence of a state of war with that country.[8] The presumption of loss of section 127 does not apply if a loss occurs before December 7, 1941, a fact adverted to in the Mayer, Reiner, and Rozenfeld cases, cited above. One cannot claim a loss under this section unless the property is in existence on that crucial date and is owned by him on that date. Adler v. Commissioner, 1947, 8 T.C. 726; Heckett v. Commissioner, 1947, 8 T.C. 841; Rozenfeld v. Commissioner, supra.

Plaintiffs herein claim loss deductions under section 23(e) (3) or section 117(j), particularly 117(j), and say that even though section 127 would have been applicable had they chosen to take deductions for war losses deemed to have occurred on December 11, 1941, that section is not their exclusive remedy and that the presumption of loss on that date is not a conclusive presumption.

**7.** The Reiner case has occasioned much comment on many different points of law. 23 U.Chi.L.Rev. 111 (Autumn 1955), "The Single Rental as a 'Trade or Business' under the Internal Revenue Code"; 9 A.L.R.2d [Supplement Service] 330, "'Net Operating loss' and its carry-back and carry-over as a deduction under Internal Revenue Code"; 41 A.L.R. 2d [Supplement Service] 691, "What constitutes 'casualty' within the provisions of Internal Revenue Code concerning de-

duction of losses arising from fires, storms, shipwreck, or other casualty."

**8.** Section 127(a) "(2) *Property in enemy countries*. Property within any country at war with the United States, or within an area under the control of any such country on the date war with such country was declared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States."

The presumption is conclusive, as against the Government, if the taxpayer chooses to rely on the section, and the Government could not refuse to permit a loss deduction just because it could show that taxpayer's property was not, in fact, physically destroyed or seized. The question, however, is whether or not the presumption is conclusive as against the taxpayer even if he does not wish to claim a loss as of that date. We believe that the presumption of section 127, when applicable, is conclusive as to the taxpayer also.

Section 127 of the Internal Revenue Code of 1939 came into the statute by section 156 of the Revenue Act of 1942, 56 Stat. 798, 852. Senate Report 1631 (77th Cong., 2d Sess.), which accompanied the bill which became the Revenue Act of 1942, explained the provision at page 127 of the Report as follows:

"This section, for which there is no corresponding provision in the House bill, provides practical rules for the treatment of property destroyed or seized in the course of military or naval operations during the war, and of property located in enemy countries or in areas which come under the control of the enemy. Two problems are likely to face the taxpayer: One is the determination of when the actual destruction or seizure occurred in cases in which the hostilities in the area prevent the determination of the exact date of the destruction or seizure, and *the other is what facts determine the loss in case the property is in an enemy area.*

"In the case of property situated in an enemy country, or in an area controlled by such country, on the date war was declared on such country by the United States, such property is under this section deemed to have been seized or destroyed on the date the United States declared war on such country. Under present conditions it is frequently impossible to determine when, if at all, the enemy country has formally seized the property located in an area under its control. *Furthermore, enemy countries today exercise such control over the property of their enemies within their territory that the loss of such property is in fact sustained whether or not the country undertakes the formality of issuing a sequestration decree or making an actual seizure.* It is a matter of conjecture as to what condition the property will be in at the termination of the war. Accordingly, such property is treated as lost upon the date war is declared, and, in view of the nature of this loss, it is treated in the same manner as other casualty losses, that is, as a loss from the destruction or seizure of the property." [Italics supplied.]

Section 127(a) (2) can be regarded as merely codifying prior case law as to what constitutes a loss, *viz.*, loss of control over and possession of property. This subsection adopts the rationale of S. S. White Dental Mfg. Co. with regard to property situated in a country at war with the United States, or in a country under the control of a country at war with the United States. The section does no more than provide a method for determining the date of loss of control over one's property, namely, the date on which war is declared. The legislative history of the section does not give a positive and conclusive answer to whether or not the section, when applicable, is the taxpayer's sole remedy, but the section was designed to avert the very type of litigation which is now before this court, and case law has so held.

The exclusive nature of section 127 was first suggested, but not decided, in Houdry v. Commissioner, 1946, 7 T.C. 666. That case, like our Mayer case, held only that section 127 is not applicable to losses occurring prior to December 7, 1941, and that section 127 does not preclude deductions for losses occurring prior to that time and otherwise deducti-

ble under other provisions of the Internal Revenue Code. Three years later the Tax Court resolved the question of the conclusive nature of the presumption of section 127 in Andriesse v. Commissioner, 1949, 12 T.C. 907, at page 913. The Tax Court said:

"It is argued by petitioner that the presumption of loss governs only if the taxpayer claims a loss under section 127 and that section 23(e) (3), if invoked by the taxpayer, still exists as a companion remedy to section 127. In our opinion the conclusive presumption in section 127 (a) (2) negatives any purpose on the part of Congress to permit the taxpayer an election to claim a loss as herein involved under section 127 in 1941 or under section 23(e) (3) in later years when actual destruction or seizure occurs."

In Andriesse, the property of the taxpayer (guilder bank accounts), was located in Amsterdam which was under the control of Germany at the time that the United States declared war on Germany. The actual transfer of the guilders from taxpayer's bank accounts to accounts of the German military authorities did not occur until May 1942, November 1942, and May 1943. The Tax Court, disregarding the actual continued existence of the property and the retention of legal title by the taxpayer until the dates of the actual transfers, found that the loss occurred on December 11, 1941.

The continued actual existence of the property "deemed" lost under section 127 had been considered earlier by the Tax Court, but always for the purpose of showing that such property was in existence on December 11, 1941, a prerequisite for a deduction under section 127, as we have already seen. Abraham v. Commissioner, 1947, 9 T.C. 222; Heckett v. Commissioner, supra; Schnur v. Commissioner, 1948, 10 T.C. 208.

The Tax Court and the Second Circuit have held that the presumption of loss of property under section 127, even when no loss deduction has been claimed by the taxpayer, is so conclusive and binding on the taxpayer that he must show facts establishing that he has recovered the "lost" property, before he can later claim depreciation or an actual physical loss of the property. Shahmoon v. Commissioner, 2 Cir., 1950, 185 F.2d 384; Solt v. Commissioner, 1952, 19 T.C. 183; Kenmore v. Commissioner, 2 Cir., 1953, 205 F.2d 90.

This court did not reach the question of the exclusive nature of section 127 in Mayer v. United States, supra, but did consider the question in Melchior v. United States, 1956, 145 F.Supp. 193, 136 Ct. Cl. 483. The taxpayers there owned certain property situated in Germany at the time the United States declared war on Germany. They apparently did not claim a war loss deduction for the year 1941. In 1945 they claimed a deduction under section 23(e) (3) for the loss of that property which was at that time physically destroyed as a result of plundering and rioting by German and Russian citizens. The court granted the Government's motion to dismiss the petition, because the claim under section 23 was not timely filed and went on to say, at page 194 of 145 F.Supp., at page 486 of 136 Ct.Cl.:

"While plaintiffs might have asserted a claim under this section [127] with respect to the property involved, that loss would have been attributable to the year 1941 or a fiscal year ended in 1942 and not for the year 1945 or 1946. The property which plaintiffs allege they owned in 1941 was alleged to have been located in Germany, and under the above section 127 losses are 'deemed' to have occurred on the date war was declared which was December 11, 1941, with respect to Germany. Andriesse v. Commissioner, 12 T.C. 907, 911–912. No recovery can therefore be had under either section. * * *"

While the court spoke in terms of no recovery being available under either section, that does not warrant an inference that the taxpayer had an election to pro-

ceed under either section. The court's only holding in reference to section 23 was that the claim thereunder was not timely filed. The fact that the court cited Andriesse with approval negatives any inference that the court would permit a taxpayer, to whom section 127 would be applicable, to elect to claim under section 23 or section 117.

As we have stated above, we are of the opinion that the losses suffered by these taxpayers occurred prior to the dates in 1943, 1944, and 1945 when the Nazi officials actually liquidated plaintiffs' property and transferred the cash proceeds to the Amtskasse. Several dates prior thereto could be selected as the date of loss. We believe that the promulgation of the confiscatory decrees was sufficient, by itself, to constitute a loss. All of these decrees were to be applied to persons such as these plaintiffs, at least according to their spirit. If the earlier decrees did not effectuate a loss of property, the decree of November 25, 1941, which, by its terms, extended to Bohemia and Moravia and the annexed territories in the East, did effectuate such a loss. The later decree of November 2, 1942, merely clarified and made more specific the earlier decree. In addition to the issuance of these confiscatory decrees, there is the fact that these taxpayers lost control over and possession of their property after their flight from the country and after certain employees replaced the family's chosen agents, Dr. Wondreys and Miss Tschinkel, and operated the family business with the consent of the Gestapo. The appointment of German administrators further shows this loss of control and possession, and the fact that one of the administrators stated he was merely managing the property until "its transfer into the property of the Reich" does not show the taxpayers had not yet suffered a loss, but again demonstrates the semblance of legality with which the Nazi officials clothed their activities with reference to property of Jewish persons. These events, occurring prior to December 11, 1941, mark not the loss of legal title to the property but the loss of all practical control over and possession of the property within the meaning of the S. S. White Dental Mfg. Co., Mayer, and Rozenfeld cases, cited above. If losses had not occurred at those times, they would be deemed to have occurred on December 11, 1941, because if plaintiffs still had anything to lose on that later date, section 127 would be applicable and, where applicable, we believe that section to be the exclusive remedy.

We find that plaintiffs are not entitled to recover and their petitions will be dismissed.

It is so ordered.

REED, Justice (Retired), sitting by designation, JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.