ERNEST ADLER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6406. Promulgated March 31, 1947.

*Benjamin Mahler, Esq.*, for the petitioner.
*Fred R. Tansill, Esq.*, for the respondent.

OPINION.

HILL, *Judge*: In our opinion petitioner has failed to prove the necessary facts to entitle him to a loss deduction in 1941. Petitioner was the only witness at the hearing. Having left Paris in mid-1940, his knowledge of the status of Adler Co.'s assets or its stock is, of necessity, hearsay.

Petitioner offered certain documents in evidence purporting to be depositions. These documents are in the form of statements by one Albert Mingasson, crier of the court to the Civil Tribunal of the Seine. These statements by Mingasson recite that the alleged deponent appeared before him and informed him of certain things, which are related in the third person. These statements are signed by the alleged deponent in each case and by Mingasson, but are not under oath. They are in narrative form, not in question and answer form. Respondent objected to the introduction of these documents in evidence on various grounds, chief of which was that they were not under oath. We reserved ruling on respondent's objection. We have carefully considered these documents, purporting to be statements by Samuel Halber, formerly secretary to petitioner, and Erich Siegfried Muhlstein, formerly bookkeeper of Adler Co., and have concluded that such statements, in so far as they relate to the status of Adler Co.'s assets in 1941 or the company's stock, constitute hearsay and, as such, are wholly ineffective as proof in support of petitioner's claim. It appears from these documents that Halber left France in June 1940 and only returned to Paris in October 1944. Consequently, Halber's knowledge of the history of Adler Co.'s assets and stock is necessarily hearsay. Muhlstein was mobilized in 1939, and since has not been connected with Adler Co. His statement is narrated in hearsay terms. For instance, the document recites that Muhlstein was demobilized in 1941 and "he learnt later that Mr. Ernest Adler had been forced to leave France, etc." and "that he had heard it said that the Company, looked upon as a Jewish enterprise, had been given a temporary Director, etc." Under these circumstances, and even aside from the question of no oath and other irregularities, these documents, in our opinion, seem clearly of a hearsay character and as such are of no value to petitioner's case.

Petitioner introduced in evidence as exhibits certain documents which are translations of certain decrees issued by the Vichy and German military authorities. These decrees, dating from May 1940 to November 1941, are concerned with registration, administration, and the treatment of Jewish concerns and property. Of the decrees introduced by petitioner, one dated November 25, 1941, is the earliest decree which explicitly provides for Jewish property becoming the

property of the German Reich. From this petitioner argues, by inference, that his stock and assets in the Adler Co. were not confiscated, expropriated, or otherwise lost prior to 1941. While we do not regard petitioner's inference in this connection as wholly unreasonable, we do not think, under the circumstances, that such an inference is sufficiently reliable to sustain petitioner's burden of proof. Respondent introduced a document dated December 12, 1940, entitled "Instructions for the Commissioners Appointed as Administrators of Jewish Establishments." These instructions state the commissioners' tasks as the elimination of Jewish influence from French economic life. To accomplish this purpose, three solutions are described. One solution is the voluntary ceding of rights by Jews to non-Jews. Another solution is the ceding by the administrator of Jewish property rights in a business to non-Jews, preferably a competitor. The last solution is the liquidation of Jewish businesses which are considered unnecessary to the French economy. These instructions strongly suggest that Jewish property rights were affected prior to the November 1941 decree introduced by petitioner. Furthermore, we do not have before us a complete picture of all the various decrees and authoritative promulgations which might bear on the fate of Adler Co.'s assets or its stock. Adler Co.'s assets, to a substantial degree, consisted of inventories of raw cocoa. Aside from the Jewish character of the business, the ownership of such a valuable food product might well have been disturbed by an occupying military force. Also, the fact that petitioner had engaged in anti-Nazi activities in Germany, France, and Belgium had resulted in his being a "marked man." There may well have been special measures against the property of such individuals beyond the scope of the decrees offered by petitioner. Not having a complete picture of the measures taken by the Nazi in occupied France, and conditions being those of war, we do not consider the inference contended for by petitioner based on the November 1941 decree as reliable or sufficiently persuasive in probative value to sustain petitioners' burden of proof.

We are faced with a situation wherein we have no direct evidence later than mid-1940 concerning the status of Adler Co.'s assets or its stock. To find for petitioner would require us to find as a fact the condition of Adler Co.'s assets and stock in the absence of any direct evidence and on the basis of inference based on decrees which, in our opinion, do not begin to represent a complete picture of the situation. While we appreciate that the problem of proof in a case of this character is a difficult one, we nevertheless must have a more substantial character of proof than has been established in the instant case. Based on the statements made by Halber and Muhlstein, it appears that these men obtained certain information from one Laurent, who was allegedly an administrator appointed by the Ger-

mans to liquidate Adler Co. No reason is apparent why the direct knowledge of Laurent could not have been obtained by proper deposition. Also Roubaud, who allegedly remained in managerial control of Adler Co. until Laurent took over, should have been able to give direct information. No reason appears why his deposition was not taken. In other words, although we are sympathetic with the proof problem of petitioner, we do not think it is unduly harsh to require some direct evidence, nor do we feel justified in making tenuous assumptions and inferences to permit loss deductions under such circumstances.

Concluding, as we do, that petitioner has failed to establish that he owned the stock in question at any time in 1941, or that Adler Co. owned the underlying assets in such year, it is obvious that no loss in 1941 can be claimed under section 23 (e), Internal Revenue Code.

Petitioner contends, however, that proof of ownership at the time the property is deemed seized or destroyed under section 127 is not a prerequisite to a deduction under such section. The remaining question, therefore, is whether for purposes of a loss deduction under section 127 (a) (2) and (3) [1] a taxpayer must prove ownership of the property involved as of the date of its presumed seizure or destruction. We have never decided this question, although we alluded to it in *Eugene Houdry*, 7 T. C. 666.[2] It is true, as we indicated in the *Houdry* case, that certain aspects of section 127 lend themselves to the interpretation contended for by petitioner, but we expressly refrained from deciding the question in that case because it was not necessary to do so. We now have the question squarely before us.

We think Treasury Regulations 111, section 29.127 (a)–1, correctly interprets the applicable provisions of section 127. That section of the regulations is as follows:

For property to be treated as resulting in a war loss, such property must be in existence on the date prescribed in section 127 (a) (2) as the date it is

---

[1] (a) CASES IN WHICH LOSS DEEMED SUSTAINED, AND TIME DEEMED SUSTAINED.—For the purposes of this chapter—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(2) PROPERTY IN ENEMY COUNTRIES.—Property within any country at war with the United States, or within an area under the control of any such country on the date war with such country was declared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States.

(3) INVESTMENTS REFERABLE TO DESTROYED OR SEIZED PROPERTY.—Any interest in, or with respect to, property described in paragraph (1) or (2) (including any interest represented by a security as defined in section 23 (g) (3) or section 23 (k) (3)) which becomes worthless shall be considered to have been destroyed or seized (and the loss therefrom shall be considered a loss from the destruction or seizure) on the date chosen by the taxpayer which falls between the dates specified in paragraph (1), or on the date prescribed in paragraph (2), as the case may be, when the last property (described in the applicable paragraph) to which the interest relates would be deemed destroyed or seized under the applicable paragraph. &ast; &ast; &ast;

[2] Petitioner relies on the *Houdry* case, *supra*, and on *Robert E. Ford*, 6 T. C. 499. In the *Houdry* case, respondent did not question that petitioner therein owned the property in question as of May 1941. In the *Ford* case, *supra*, stipulation No. 9 recited that petitioner owned the bonds in question in 1941. Consequently, in neither of those two cases was there any necessity for deciding the question involved in the instant case.

deemed destroyed or seized or at the beginning of the period prescribed in section 127 (a) (1) or (a) (3), within which period the property is deemed destroyed or seized, *and for the taxpayer to claim a loss with respect to such property he must own such property or an interest therein at such time.* If, before such time, the property was destroyed or confiscated, section 127 is not applicable with respect to such property. For example, a taxpayer owned property in an enemy country before war was declared on such enemy by the United States and such property was confiscated by the enemy before the date war was declared. The seizure was not in the course of military or naval activities. The taxpayer may not claim a war loss with respect to such property under section 127. [Italics supplied.]

The presumed loss and the presumed time of its occurrence under subsection (2) constitutes in a sense an anticipatory or accelerated loss and does not operate to postpone losses previously sustained. It seems apparent to us that Congress, in enacting subsections (2) and (3), was addressing itself to the problem of proving loss by a taxpayer *owning* property in an enemy country or area at the time of or *after* the United States had declared war on such country.[3]

We can discover no indication in the legislation or the congressional reports that Congress intended by enacting subsections (2) and (3) to ameliorate any proof problem facing a taxpayer losing property in an enemy country or area prior to a declaration of war. It seems to us that, while section 127 goes a long way towards relieving a taxpayer of troublesome proof problems, it does not eliminate the necessity for establishing the fact fundamental to all loss claims, i. e., that the taxpayer had something to lose.[4] To construe section 127 as eliminating the necessity for proving such a fundamental fact would, in our opinion, lead to results never intended by Congress. We

[3] Senate Report No. 1631, 77th Cong., 2d sess. (C. B. 1942–2, pp. 599, 600), states in part as follows:

"* * * Two problems are likely to face the taxpayer: One is the determination of when the actual destruction or seizure occurred in cases in which the hostilities in the area prevent the determination of the exact date of the destruction or seizure, and the other is what facts determine the loss in case the property is in an enemy area.

"In the case of property situated in an enemy country, or in an area controlled by such country, on the date war was declared on such country by the United States, such property is under this section deemed to have been seized or destroyed on the date the United States declared war on such country. Under present conditions it is frequently impossible to determine when, if at all, the enemy country has formally seized the property located in an area under its control. Furthermore, enemy countries today exercise such control over the property of their enemies within their territory that the loss of such property is in fact sustained whether or not the country undertakes the formality of issuing a sequestration decree or making an actual seizure. It is a matter of conjecture as to what condition the property will be in at the termination of the war. Accordingly, such property is treated as lost upon the date war is declared, and, in view of the nature of this loss, it is treated in the same manner as other casualty losses, that is, as a loss from the destruction or seizure of the property."

[4] The use of the word "property" in the context of section 127 we think connotes ownership. Webster's New International Dictionary defines property as follows:

"(5) That to which a person has a legal title; thing owned; an estate, whether in lands, goods, money or intangible rights, such as copyright, patent rights, etc.; anything, or those things collectively, in or to which a man has a right protected by law; * * *"

"Property" is also defined as "(7) Thing, or things in general, without implying ownership." This latter definition would seem to us virtually meaningless in the context of section 127.

conclude that petitioner must establish ownership of the property involved as of the time of presumed loss to become entitled to a deduction under section 127 (a) (2) and (3). This petitioner has failed to do and it follows that respondent's determination must be sustained.

Reviewed by the Court.

*Decision will be entered under Rule 50.*