Bella Feinstein and Abraham Feinstein v. Commissioner.
Feinstein v. Commissioner
Docket Nos. 27187, 27188.
United States Tax Court
1952 Tax Ct. Memo LEXIS 310; 11 T.C.M. (CCH) 186; T.C.M. (RIA) 52051; February 28, 1952
John J. Halpin, Esq., for the petitioners. Robert J. McDonough, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent has determined deficiencies in income tax for the year 1945 as follows: Docket No. 27187, Bella Feinstein
$4,077.55
Docket No. 27188, Abraham Feinstein
$7,663.23
There are two issues, each of which involved two claims for loss deductions in 1945. The petitioners contend that the questions under the first issue are: (a) Whether the petitioners *311 sustained a loss in 1945 in the amount of $5,000 from the theft or loss of personal belongings - the furnishings in an apartment in Bucharest, Rumania. Each petitioner claims deduction for a loss in the amount of $2,500. (b) Whether the petitioners sustained a loss in 1945 in the amount of $7,500 from the theft or loss of personal belongings - furniture - which was stored in Paris, France. Each petitioner claims deduction in the amount of $3,750. The losses are claimed under section 23 (e) (3) of the I.R.C. and are not claimed under section 127 which the respondent contends is the only applicable section. The second issue relates to alleged loans which the petitioners contend became worthless in 1945. It is contended by the petitioners that the alleged bad debt losses are deductible under section 23 (k). The respondent contends that only section 127 is applicable. The questions are: (a) Whether the petitioner Abraham Feinstein made a loan in 1939 of 18,000 zlotys; whether the alleged loan of zlotys had an exchange value in American dollars of $3,384; and whether the alleged loan of $3,384 became worthless in 1945. (b) Whether the petitioners made a joint loan *312 in 1937 of 2,000,000 lei; whether the exchange value in American dollars of the alleged loan was equal to $10,000; and whether the alleged loan became worthless in 1945. The petitioners appear to contend that the loans gave rise to business bad debts under section 23 (k) (1), if that section is at all applicable. In the alternative, the contention must be that the alleged loans gave rise to losses from non-business bad debts under section 23 (k) (4), if that section is applicable. The respondent has denied each petitioner the deductions claimed, and the petitioners allege that denial of the deductions was incorrect. The petitioners filed separate individual income tax returns for the year 1945 with the collector for the first district of New York. Findings of Fact The petitioners are husband and wife. They maintained their residence during 1945 at Forest Hills, Long Island, New York. Each of the petitioners is a naturalized citizen of the United States, having become naturalized in March, 1947. The petitioner Abraham Feinstein is a businessman who follows the European custom of using the title of "Doctor." In 1945 the petitioners were partners in a partnership called A. Feinstein *313 and Company, which is a personal holding company holding securities and other property for the petitioners. During 1945 the petitioner Abraham Feinstein was president of a corporation known as Amertrade, Inc. which had offices in New York City, and which carried on an import and export business. In his income tax return for 1945, Dr. Feinstein reported salary from the Amertrade corporation in the amount of $11,425 and one-half of the income of A. Feinstein and Company, the partnership, in the amount of $153.54. Mrs. Feinstein's only source of income during 1945 was her share of the income of the partnership which she reported in her return in the amount of $153.54. Each of the petitioners reported one-half, $17,084.47, of capital gains realized during 1945. Prior to their naturalization as citizens of the United States, the petitioners were citizens of Poland. In March, 1938, the petitioners resided in Vienna. They left Vienna in March, 1938, and went to Switzerland. In 1939, they went to England. They arrived in the United States in March, 1940. Dr. Feinstein organized Amertrade, Inc. in 1940; its business is the import and export business. The petitioners were not engaged in *314 a business of loaning money in 1945, or in any banking business. The petitioners shipped two van loads of used household furniture from Vienna to Paris in 1938 or 1939. Mrs. Feinstein executed, in Paris on August 11, 1939, an owner's declaration in respect of household effects before a British vice-consul. She stated in the declaration that the goods listed had been used and in her possession for more than one year. The furniture was stored in the Bonded Customs Warehouse in Paris. In 1944 and 1945, Wilhem Dubensky, a legal adviser of Dr. Feinstein in Paris, made unsuccessful efforts to locate and recover the furniture which had been in Paris in transit for shipment out of France. He took steps to locate the property immediately after "the Liberation" of France. None of the property was in the Customs Warehouse in Paris in 1944 and 1945, and officials told him that they did not know what had become of the property. The Customs Warehouse in Paris was not bombed or otherwise damaged during the war. Dubensky wrote to Dr. Feinstein a little later than 1945 because he did not have his address "at first." When he wrote, he told Dr. Feinstein that he could not locate the goods. Dr. *315 Feinstein had an apartment in Bucharest which was furnished by him. He left the furniture there when he departed. During the war the building where it was located was bombed, but the part of the building where the apartment was located was not damaged. Bucharest was under the control, at first, during the war, of Legionaries. They constituted the government. Later, Bucharest was occupied by the Germans and was controlled by German authorities. Following that, the city fell under the control of Russian authorities. A friend of the petitioners, Jean Clejan, inquired about their furniture, and at some undisclosed time he was allowed entrance only into the hallway of the apartment. He was denied entrance beyond the hall. The apartment was seized and occupied by unknown authorities. He does not recall the date when he went to the apartment. He was unable to recover the furniture. There was no procedure available for making claim for the property. It was very difficult to make any claim because all property belonging to Jews was seized and there was no way of making recovery. Dr. Feinstein carried on an import and export business in Bucharest from 1932 until 1938. In 1939, Dr. Feinstein *316 loaned 18,000 zlotys to a finance company in Warsaw, Poland, having the name of Polsko-Rumumskie Cowarzystwo Handlowo (Polish-Rumanian Commercial Corporation). The loan was for a year or so. An attorney, Policrat, endeavored unsuccessfully to collect the loan in 1944. In 1937, the petitioners made a loan of 2 million lei to a Rumanian corporation located in Bucharest, the Anglo-Americ corporation. The corporation was in sound financial condition at the time the loan was made. Teoder Negreanu, an attorney and a director of Anglo-Americ, was familiar with the affairs of the corporation until 1941, when he departed. He was not in Rumania in 1944. At some time before the armistice, the Rumanian government seized and confiscated all of the assets of the corporation and appointed a liquidator. The property was confiscated in the prosecution of the policy of confiscating property belonging to Jews. Jean Clejan, a friend of the petitioners, was a director of Anglo-Americ prior to 1944. In 1944 he had no association with the corporation. He has no knowledge respecting the liquidation of the corporation. The petitioners sustained war losses prior to 1945 from the loss of two lots of furniture *317 in Paris and Bucharest, and from the two worthless debts. Opinion The petitioners contend that the questions properly are to be considered under sections 23 (k) and (e) (3). We understand it to be the view of the petitioners, also, that the losses in question should not be classed as war losses. The respondent contends that the questions arise under and must be considered under section 127 because the losses are war losses, and section 127 is the provision of the Code which was intended exclusively to cover war losses. He relies primarily upon Abraham Albert Andriesse, 12 T.C. 907, 913. We agree with the respondent that the losses in question fall under section 127 rather than sections 23 (k) and (e). The petitioners tried the issues as though sections 23 (k) and (e) were properly to be applied and avoided meeting a section 127 issue. But their evidence shows that the losses resulted primarily from conditions which were incident to war conditions in Poland, Rumania, and France. The losses must be considered as war losses within the intendment of section 127. We may properly take judicial notice of certain historic facts which are, in general, as follows: Germany *318 was at war with Poland on September 1, 1939, and the U.S.S.R. invaded Poland on September 17, 1939. Russia was invaded by Germany and Rumania on June 22, 1941. Rumania declared war on the United States on December 12, 1941. France declared war on Germany on September 3, 1939; signed an armistice with Germany on June 22, 1940; and ended relations with the United States on November 8, 1942. Unoccupied France was invaded by Germany on November 11, 1942. Also, it is an historic fact that during the war it was the policy of some governments or governmental authorities to confiscate the property of Jews. Negreanu and Clejan have given testimony in their depositions which lead to the conclusion that the losses of assets of the petitioners in Rumania, the loan and the furniture, resulted from such confiscation. Lacking evidence to the contrary, it must be assumed that there was disruption of normal business operations in Poland due to the invasions and the circumstances of war which was a cause of loss of the Polish loan; and that the loss of property left in a customs warehouse in Paris during the war period is explained by the conditions of that period. Section 127 contains provisions *319 which were intended to relieve taxpayers from the problems of proving some facts relating to war losses; but, also, it limits the years within which war loss deductions may be taken, and requires that the taxpayer must show that he owned the property for which a loss deduction is claimed on the date of the presumed seizure of the property. Ernest Adler, 8 T.C. 726, 731; Regulations 111, sec. 29.127 (a)-1, (a)-2, (a)-3, (a)-4; sec. 29.127 (b)-1. Presumably, if the petitioner had elected to press his claims for deductions under section 127 the proper year would have been before 1945. The petitioners appear to present a theory that the property in question was not lost as a result of such seizure and destruction as is contemplated by section 127. With this theory we do not agree upon the entire record. However, passing the point of the application of section 127, and the facts which must be established thereunder, Ernest Adler, supra; Eric Heckett, 8 T.C. 841; and Abraham Albert Andriesse, supra, the petitioners must be denied the claimed loss deductions because they have failed to establish the facts required by sections 23 (k) *320 and (e) (3), even if those sections could be applied here. The evidence does not establish that the losses were sustained in 1945 rather than in some prior year. The evidence establishes, in fact, that these losses were sustained before January 1, 1945. With respect to the bad debt losses, the petitioners have proceeded as though the old rule applied to the year 1945 (it was changed in 1942) which was that the year of the deduction of a bad debt loss is the year in which the taxpayer ascertains that the debt is worthless, and makes a charge-off. Also, the deductions in 1945 for the losses of the furniture in Bucharest and Paris must be denied because the evidence establishes that these losses were sustained prior to 1945, and it is immaterial that the petitioners ascertained in 1945 that the two lots of furniture were lost and could not be recovered. Or, if we err in concluding that the evidence shows clearly that the furniture was lost, or confiscated, or stolen before 1945, at least the evidence fails to establish that the loss occurred during 1945. Furthermore, the petitioners have failed to show the fair market values of each lot of furniture immediately before the loss. Helvering v. Owens, 305 U.S. 468. *321 The depositions of Negreanu and Clejan indicate with almost certainty that the Anglo-Americ corporation and the furniture in Bucharest was confiscated before 1945 by either the Legionaries, the Germans, or the Russians. The petitioners have no knowledge about what happened to the Polish corporation after the invasion of Poland in 1939. The deposition of Dubensky does not establish that the furniture in Paris was not seized or stolen before 1945, and indicates that it could not be located even in 1944. It is held that the petitioners are not entitled to any of the claimed loss deductions in 1945, and the respondent's determinations are sustained. Decisions will be entered for the respondent.