Chantoub Benichou v. Commissioner.
Benichou v. Commissioner
Docket No. 5078-67.
United States Tax Court
T.C. Memo 1970-263; 1970 Tax Ct. Memo LEXIS 93; 29 T.C.M. (CCH) 1156; T.C.M. (RIA) 70263; September 21, 1970, Filed. Emilio A. Dominianni and Michael Keating, Pan American Bldg., 200 Park Ave., New York, N. Y., for the petitioners. Marlene Gross and Stanley J. Goldberg, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: Respondent determined a deficiency in the amount of $14,738.89 in the petitioner's *95 Federal income tax for the taxable year 1963. Due to concessions by the petitioner the sole issue for decision is whether certain property owned by the petitioner was confiscated or expropriated by the Government of Algeria in 1963 and, if so, whether petitioner is entitled a deduction as a loss under section 165[1] as a result thereof and the amount of any loss determined to be deductible. Findings of Fact Some of the facts were stipulated at trial and are found accordingly. Chantoub Benichou (hereinafter referred to as petitioner) is a naturalized citizen of the United States. At the time of the filing of the petition herein he resided in Paris, France. He filed his Federal income tax return for the year 1963 with the district director of internal revenue for the Manhattan district of New York. The petitioner was born on June 16, 1886, in Tlemcen, Algeria. During the years 1937 to 1963 the petitioner was in the export business; he was a manufacturer of children's clothing and he owned real property in Algeria and Morocco. On November 25, 1937, the petitioner purchased at public *96 auction property located in the canton of Montagnac, district of Tlemcen, Algeria, consisting of approximately 318 hectares of land (one hectare equals 2.47 acres). This property will be hereinafter referred to as La Tafna. At the time of purchase approximately 90 hectares were planted with American grape vines; there was a residence "for the owner," workers' quarters and a wine cellar with an 8,000 hectoliter capacity (one hectoliter equals 26.418 gallons). The total cost of La Tafna, including land, buildings and plantings, was 2,355,980.86 old francs. This amount includes the payment of notarial and legal fees and, in general, all of the expenditures necessary to effect a closing under Algerian law. Of the total purchase price the petitioner paid 2,263,471.18 old francs in 1937 and 92,509.68 in 1938. In 1937 the official conversion rate was 29.47 old francs to one United States dollar and in 1938 the rate was 38.01 to the dollar. The total purchase price of La Tafna in United States currency was therefore $79,239.76. The petitioner was the sole owner of La Tafna. The petitioner evolved a plan of development for La Tafna. His intention was to invest large amounts of capital in *97 order to realize a "big profit." Toward this goal the petitioner initially hired 60 to 70 employees. Subsequently this number was expanded to approximately 160. In addition the petitioner employed Alma Dovar Baistar as an accountant in order to maintain books and records at La Tafna. When Baistar died in 1958 his duties were taken over by another accountant, Albert Sigsig. The petitioner's brothers, Simon and Joseph, were also active in the operation of La Tafna in managerial capacities. Simon oversaw the day-to-day 1157 operation of the farm, purchasing of plants and machinery and the hiring and firing of employees, while Joseph was a more general overseer. Joseph would visit the farm every week or two in order to check the books and records and to confer with the accountants and the farm manager. The petitioner himself regularly visited the farm except for the period between 1940 and 1946 when he resided in the United States and could not journey to Algeria due to the Second World War. During the years from 1938 until 1962 the petitioner, in consequence of his plans for the development of La Tafna, made the following capital expenditures for planting, equipment and building: *98 1158 Improvement
Year of Acquisition
Cost -- OldFrance
[1] ConversionFrances/Dollars Cost --Dollars
[2] Length of Development Expenditures for Planting
Ground Preparation for Vines (53 Hectares)
1944-45
2,000,000
[3] $119.30
$16,764.46
Planting Grape Vines (11 Hectares)
1948
11,000,000
266.16
41,328.52
8 Years
Planting Grape Vines (14.5 Hectares)
1948-49
56,300,000
[4] 307.58
183,041.81
8 Years
Planting Grape Vines (11.48 Hectares)
1951-52
13,000,000
349.95
37,148.16
8 Years
Planting Grape Vines (5.3 Hectares)
1954
7,000,000
350.00
20,000.00
8 Years
Planting Grape Vines (14.5 Hectares)
1955
16,000,000
350.00
45,714.29
8 Years
Planting Grape Vines (10.58 Hectares)
1961-62
12,000,000
490.00
24,489.80
8 Years
47,067 Citrus Trees
1951-61
200,000,000
[5] 349.95
571,510.22
8 Years
40,000 Cyprus Trees
1951-61
20,000,000
349.95
57,151.02
8 Years
800 Olive Trees
1938-39
1,500,000
40.95
36,630.04
30 Years
3,000 Olive Trees
1955-59
14,000,000
420.00
33,333.33
30 Years
2,450 Almond Trees
1957-59
890,000
490.60
1,814.11
15 Years
800 Pine Trees
1945-54
1,200,000
349.00
3,483.40
8 Years
4,900 Peach, Apple, Pear Trees
1957-60
3,170,000
490.70
6,460.16
8 Years
600 Prune, Apricot, Medlar Trees
1945-50
1,500,000
192.73
7,782.91
8 Years
Expenditures for Construction
400 Cubic Meter Water Tank (Concrete)
1938
1,200,000
38,01
31,570.64
Zinc Gutter System
1946-47
300,000
119.30
2,514.67
Cattle Stable
1938
650,000
38.01
17,100.76
Wine Factory
1938
5,500,000
38.01
144,698.76
Wine Factory Enlargement
1939-40
2,500,000
43.90
56,947.61
Wine Machinery
1939
3,500,000
43.90
79,726.65
Manager's Dwelling
1938
2,200,000
38.01
57,879.51
Caretaker's Dwelling
1939
1,000,000
43.90
22,779.04
Loading Platform
1939
150,000
n6 43.90
3,416.86
Water Conduit Gallery & Reservoir (Cement)
1942-43
1,500,000
[6] 119.30
12,573.34
Water Tower (Concrete & Iron)
1947
1,500,000
119.30
12,573.34
Cistern (Concrete)
1947
800,000
119.30
6,705.78
Storage Ditches (Cement)
1948
200,000
266.16
751.43
Workers' Dwellings
1949
2,500,000
349.00
7,163.32
Reservoir (Concrete)
1949
1,500,000
349.00
4,297.99
Piping (Steel)
1949
2,000,000
349.00
5,730.66
850 Meter Road
1950
800,000
349.90
2,286.37
Expenditures for Construction (Continued)
100,000 Liter Petroleum Tank (Cement & Metal)
1952
475,000
[7] 349.95
$1,357.34
Pumping Station Floor
1952
200,000
349.95
571.51
Motor Pump & Installation
1952
450,000
349.95
1,285.98
Piping (Cast Iron)
1952
50,000
349.95
142.88
Electrical Transformer
1952
400,000
349.95
1,143.02
Pumping Station
1955
1,000,000
350.00
2,857.14
Telephone Installation
1955
70,000
350.00
200.00
Cast Iron Pipe 200 Millimeters
1960
3,000,000
490.30
6,118.70
Farm Bquipment
Hanomag Tractor
1952
3,760,000
349.95
10,711.39
2 Bolinders Tractors
1959
3,600,000
490.90
7,333.47
Harvester (Used)
1961
100,000
490.00
204.08
Sprayer (Used)
1961
150,000
490.00
306.12
Produce
1,450 Hectoliters of Wine
1963
11,000,000
490.20 22,439.82
Total
$1,610,073.41
*99 *100 1160 All of the above items were on La Tafna in 1963. However, there were three occurrences which caused differing amounts of damage to the property. In 1947 there was a severe hailstorm which damaged approximately 5,000 square meters of roofing as well as certain plants. Joseph estimated the damage to be approximately 1,695,550 old francs or $14,212.49. In 1954 there was a flood which damaged 4,000 apple trees, 3,000 pear trees, 5,000 orange trees and an unknown quantity of cypress trees. The total loss was approximately 23,804,000 old francs or $68,011.43. Finally, in May of 1956 the Algerian rebellion began. From 1956 to 1961 there were frequent raids on La Tafna by Algerian rebels. In 1956 the farm manager was killed. The 1958 arsonists caused two fires which damaged and destroyed, among others, approximately 16.5 hectares of vines, 315 orange trees, 450 cypress trees, 30 lemon trees and 700 olive trees. Joseph estimated the crop damage to be approximately 8,912,000 old francs, [2] in addition to approximately 2,000,000 old francs damage to various farm buildings. At 1958 exchange rates the total damage would have amounted to $22,242.15. *101 In November of 1962 the petitioner received a bill for taxes due on the conduit of water from the Ministry of Finance, General Management of Taxation, for the period of August 10, 1962, to August 10, 1963. This bill was paid in 1962. On January 23, 1963, the petitioner's cashier paid Agricultural Social Insurance on behalf of La Tafna at Tlemcen. During 1963 the petitioner paid real estate taxes for 1963 on La Tafna to the Department of Tlemcen, Township of Montagnac. The petitioner received an authorization to sow barley from the General Delegation of the Government in Algeria, Algerian Section of National Interprofessional Office of Cereals, dated January 30, 1963. On or about January 11, 1961, the petitioner purchased at auction real property (hereinafter referred to as Ain Kial) located in the canton of Ain-Temouchent, Algeria, consisting of approximately 95 hectares of land of which 14 were planted with American vines, one with almond trees, and 61 with olive trees. There were two groups of buildings, the first consisting of a building with two rooms and attached stables and shed, and the second consisting of two rooms and an attached storeroom. The total cost of Ain Kial *102 was 18,101,029 old francs [3] or $36,940.88 at the 1961 rates of exchange, 490 old francs to the dollar. On September 16, 1961, the petitioner leased Ain Kial to Benahmed Limane for 1/3 of Liman's grape harvest. Although the petitioner made several demands for rent from his tenant he never received any rental payments. The petitioner made claims for rent with the Prefect of Temouchent and the Prefect of Tlemcen but received nothing. In January of 1963 the petitioner who was then residing in New York, having left Algeria before the independence of July 1, 1962, received a telegram from his brother, Simon, in Algeria. The telegram stated that Simon had been informed by the manager of La Tafna that the property had been nationalized. After receiving this telegram the petitioner journeyed to Algeria and immediately proceeded to La Tafna. When the petitioner and Simon *103 arrived at the farm they were met by the former caretakers, bearing machine guns. These men refused them admittance. After remaining at La Tafna for approximately a half hour the petitioner went to see the director "of all the farms which had been seized" in Montagnac. The director showed the petitioner a telegram from the Algerian Government directing the seizure of the petitioner's farm. The petitioner then went to see the prefect, a superior of the director, who stated that he had not been told to seize La Tafna. However, despite the petitioner's entreaties no aid was offered. Petitioner also saw the Algerian vice president, who was a personal acquaintance, but no assistance was granted. He then visited the Minister of Agriculture who delegated one Madani to investigate the petitioner's claim. It was Madani's duty to determine if the petitioner had made proper use of La Tafna. He asked the petitioner questions concerning sowing and irrigation. Subsequently, Madani informed the petitioner that he had visited La Tafna along with the director 1161 of Montagnac and that after interviewing various of the petitioner's employees it was his opinion that everything was satisfactory. *104 However, petitioner did not receive the return of his property. There after the petitioner directed Simon to employ Jean Emmanuel Lalande, an agricultural engineer, qualified by the Tribunal of Algeria, to report on the use and condition of La Tafna. Lalande's report, dated March 16, 1963, stated that he proceeded with a study of accounting and administrative documents relating to the management of the farm * * * for the fiscal year 1961-1962 and up to 22 January, 1963, date of the occupation by the SAP of Montagnac and whereby consequently, he lost his rights of control. According to this report Lalande found all at La Tafna to be in order. But this also availed the petitioner nothing. Thereafter petitioner employed an attorney and commenced legal action in the Civil Tribunal of Tlemcen against the Algerian Government on June 1, 1963, to recover La Tafna. In that proceeding the petitioner contended that he received no decree and that the taking of his property was an act of violence. The Tribunal held that it did not have jurisdiction to decide the case and did not grant the petitioner relief. Subsequently, the petitioner requested the aid of the United States Government *105 in recovering his property or obtaining compensation therefor. The petitioner was notified in a letter from the Embassy of the United States dated April 23, 1965, that the Algerian Government refused to deal directly with American claimants but that a claim was to be submitted on his behalf by the embassy. To the date of trial the petitioner has not received the return of La Tafna nor has he been compensated for its loss. Neither has the petitioner been able to achieve the return of the books and records kept at La Tafna during the period from 1937 to 1963. Concerning his property Ain Kial, towards the end of 1963 the petitioner received a document bearing the seal of the Republic of Algeria and dated October 1, 1963, from his tenant, Benahmed Limane. This document read in pertinent part as follows: CONSIDERING the law NR 62157 of December 31, 1962 tending to extend the rulings in force on December 31, 1962, CONSIDERING the decree NR 63,168 of May 9, 1963 concerning the placing under the protection of the State of personal and real properties in which the mode of acquisition, management, exploitation or utilization is of a nature susceptible to trouble public order and social *106 peace, * * * ARTICLE 1: The agricultural exploitation belonging to Mr. Benichou Chantoub, and all the installations connected therewith, situated at Ain-Kial, are placed under the control and management of the State. ARTICLE 2: The Secretary General of the Prefecture of Oran, the Sub-Prefect of Ain-Tremouchent, are in charge of the enforcement of this decree. The petitioner, to the date of trial, received no compensation for Ain Kial. Ordonnance No. 62-020 of August 24, 1962, published in the Journal Officiel de l'Etat Algerien (hereinafter referred to as Journal Officiel) of September 7, 1962, provided, in part, as follows: [The] Prefects may * * * open and operate any establishment engaged in * * * agriculture which is not in operation and is therefore hampering local or national economic activity. This ordinance further provided that managing directors be appointed. The ordinance also provided that the owner of a particular property could have it restored to him if certain conditions were met. The ordinance was made effective 30 days after its publication. Decree No. 62-02 of October 22, 1962, published in the Journal Officiel of Octob 26, 1962, provided for the *107 appointment of "Management Committees" for "unoccupied farms." This decree ordered compliance within 8 days of publication and was promulgated over the name of Ahmed Ben Bella, Prime Minister. Decree No. 63-88 of March 18, 1963, set forth the procedures for declaring property vacant and therefore subject to state management. This decree further provided that a determination of vacancy would become final, if no appeal were made, within 2 months of the publication of a "vacancy decision." Decree No. 63-168 of May 9, 1963, published in Journal Officiel of May 14, 1963, provided, in part, that agricultural enterprises would be placed under the "protection" of the State after an investigation by the local prefect if the "method of acquisition, management, operation, or utilization 1162 is likely to disturb law and order." Appeal from prefectural orders were to be made only within one month of publication. On his individual Federal income tax return for 1963 the petitioner indicated that he had suffered a loss of $1,498,524 "on Algerian property confiscated by Algerian Government in January 1963 * * *." Due to his deduction of part of this loss the petitioner claimed a net loss *108 for 1963 and accordingly reported no taxable income. In his statutory notice the respondent stated: (a) The deduction of $1,500,000.00 [4] claimed on your 1963 income tax return as a loss resulting from the confiscation of your property in Algeria by the Algerian Government in 1963 is disallowed because you have not established that the loss was incurred in a trade or business or in a transaction entered into for profit, and that the loss was sustained in 1963 and also because you have not established the amount of the deductible loss. Opinion At the outset a comment must be made on the state of the record. Due to the advanced age of the petitioner, the fact that the trial was of necessity conducted through an interpreter, the fact that books, records and other documents were often unavailable and when available were in translation, our finding of the facts was made exceedingly difficult. In many instances the product of our labors may have less than the clarity and continuity we deem desirable; however, we have done *109 our utmost with the record offered. In view of the petitioner's burden of proof it was necessary to construe any absence or ambiguity of proof against him. This case presents the question of whether the petitioner is entitled to a loss deduction under section 165 with respect to two farms which the petitioner contends were expropriated or confiscated by the Government of Algeria in 1963. It is the respondent's position that the petitioner has failed to carry his burden of proving that an expropriation or confiscation of La Tafna and Ain Kial in fact occurred in 1963. Section 165 provides, in pertinent part, as follows: (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business * * * [5]
*110 In order to be deductible under section 165(a) "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year." Section 1.165-1(b) Income Tax Regs.; Boehm v. Commissioner, 326 U.S. 287, 292 (1945); United States v. S.S. While Dental Mfg. Co., 274 U.S. 398 (1927). The determination of whether a loss occurred during the taxable year is purely one of fact. "Such an issue of necessity requires a practical approach, all pertinent facts and circumstances being open to inspection and consideration * * *." Boehm v. Commissioner, supra, at 292. The test is flexible, practical rather than legal. Boehm v. Commissioner, supra, at 293; Lucas v. American Code Co., 280 U.S. 445, 449 (1930); Cayetano R. Ribas, 54 T.C. 1347, June 22, 1970. With respect to La Tafna the respondent argues, on brief, that the petitioner has failed to prove an expropriation or confiscation primarily because he did not offer an Algerian *111 decree pursuant to which an expropriation or confiscation took place. We do not find this argument convincing. Such a decree is merely evidentiary, not an absolute prerequisite to the establishment of a loss. The respondent's own published position takes cognizance of this principle. Revenue Ruling 62-197, 1962-2 C.B. 66, 69, states in part: 1163 The burden of proof is upon the taxpayer to establish by whatever evidence is available the occurrence of the act and the date thereof to support a deduction for a loss. An officially published expropriation decree (or similar document) will in general be considered prima facie evidence of Cuban confiscation as of the date of the decree. Naturally, all other evidence which is available to the taxpayer or the Service will be used, to the extent material, in establishing loss and the date thereof. See also Rev. Rul. 65-172, 1965-2 C.B. 49, 50. As we have stated above the test of loss is a practical one - the loss of control or "ownership" of one's property and not necessarily loss of legal title. Rozenfeld v. Commissioner, 181 F. 2d 388, 389 *112 (C.A. 2, 1950), affirming a Memorandum Opinion of this Court; Wyman v. United States, 166 F. Supp. 766 (Ct. Cl. 1958). In the instant case the petitioner claims that La Tafna was expropriated or confiscated in 1963 and he has presented ample proof in support of his assertion. In January of 1963 the petitioner, who was then residing in New York City, received a telegram from his brother, Simon, in Algeria stating that La Tafna had been expropriated. When the petitioner arrived at La Tafna and attempted to gain admittance he was met by armed men who refused him access to his property. Thereafter, the petitioner spoke with various Algerian officials on the local and national level in the attempt to secure the return of La Tafna. His efforts culminated in his bringing legal action in the Civil Tribunal of Tlemcen against the Algerian Government for the recovery of La Tafna in June of 1963. The court held that it had no jurisdiction and refused to grant the petitioner relief. By this time, at the latest, "closed and completed transactions" had occurred which were "fixed by identifiable events occurring in" the taxable year 1963. Section 1.165-1(d)(1), Income Tax Regs. *113 If one is denied access to one's property by armed guards, is denied relief by a court, and has never been permitted since that seizure to enjoy the fruits of ownership, common sense, which should play a role in the administration of our tax laws, requires us to find that the petitioner has, indeed, suffered a loss. The fact that in 1965 the petitioner was notified that the United States Government would file a claim in his behalf is immaterial. "The taxing act does not require the taxpayer to be an incorrigible optimist." United States v. S.S. White Dental Mfg. Co., supra, at 403. On brief the respondent directed our attention to several factors which, it was argued, indicate that the petitioner's property was not expropriated during 1963. One of these factors upon which the respondent placed substantial emphasis was that the petitioner paid certain real estate taxes during 1963 for 1963 on La Tafna to the local prefecture. This it is claimed shows that the Algerian Government regarded the petitioner as the owner. We do not find this reasoning persuasive in view of the fact *114 that the petitioner was dispossessed of the dominion and control of his property. In addition, it does not appear when during 1963 the petitioner paid the taxes in question. Other transactions during 1963 respecting La Tafna, i.e., payment of social insurance and the dating of an authorization to sow, occurred in January while the loss of La Tafna occurred as late as June. Finally, the payment of taxes may have been an adjunct of the possession of legal title. As we stated above we are not as concerned with title as with the concept of ownership in the practical sense of the word. Towards the end of the trial of this case the respondent offered into evidence four ordinances and decrees promulgated by the Algerian Government. In his reply brief the respondent argues that these decrees govern the use and possession of property by Algerian citizens, but not until 1964, 1965 and 1966 did decrees appear which purported to "nationalize" various industries. Although we feel that the respondent's conclusions are subject to question, and in view of our opinion that restriction of use and possession may be sufficient to give rise to a loss we do not deem it necessary to launch into a discussion *115 of Algerian law. Suffice it to say, that it is well recognized that property may be expropriated by actual seizure before the effective date of an official decree. [6] See 1164 James Speyer, 30 B.T.A. 517, 524, et seq. (1934), affirmed 77 F. 2d 824 (C.A. 2, 1935). The fact that an effective decree is promulgated concerns the legality of the seizure and not whether the seizure itself gives rise to a loss for income tax purposes. Once the taxpayer's use and possession is so restricted as to amount to an expropriation it becomes immaterial that the restriction was illegal under the laws of the restricting nation. Rozenfeld v. Commissioner, supra, at 389; Wyman v. United States, supra, at 770. A decree may be a mere formality. Harry J. Colish, 48 T.C. 711, 716 (1967). *116 With respect to the petitioner's property, Ain Kial, the situation is in reverse. The petitioner presented the Court with a decree, albeit received from the petitioner's tenant farmer, which stated that Ain Kial was thereby "placed under the control and management of the State." The respondent argues that this decree is insufficient to show that the petitioner's property was expropriated or confiscated. We disagree. As was the case with the expropriation or confiscation of La Tafna the determination concerning Ain Kial is purely factual. The decree along with the fact that the petitioner lost dominion and control of his property and was left without realistic expectation of recompense convinces us that Ain Kial was taken by the Algerian Government. On brief the respondent raises the fact that the petitioner failed to offer testimony concerning Algerian law, and cites Bernhard Altmann, 20 T.C. 236 (1953), vacated and remanded on other grounds in an unpublished order ( C.A. 2, 1955, 55-2 USTC 9599, 48 AFTR 1867); and Havana Electric Railway, Light and Power Co., 29 B.T.A. 1151 (1934), for the proposition that expert testimony may be necessary *117 to resolve doubts as to the effect of foreign decrees. It is true that such expert testimony is admissible to throw light on ambiguous decrees; however, we can find no authority which indicates that such evidence is required. The decree in the within case is clear as to its effect on its face. The decree along with the petitioner's testimony adequately carries the petitioner's burden of proof. As we set forth in our findings of fact the decree bore the seal of the Republic of Algeria, was dated October 1, 1963, and stated, in part: ARTICLE 1: The agricultural exploitation belonging to Mr. Benichou Chantoub, and all the installations connected therewith, situated at Ain-Kial, are placed under the control and management of the State. [7]
From this clear language there can be no doubt that the decree was self-executing and effective as of its date. In view of the fact that the petitioner never regained dominion and control of his property nor received any rent for its use it appears that *118 the requisite "closed and completed transactions * * * fixed by identifiable events * * *," section 1.165-1(d), Income Tax Regs., occurred during 1963, giving rise to a loss. The respondent in his arguments concerning both La Tafna and Ain Kial discussed many cases of this and other courts. Some of these cases we have mentioned above; we found these to be more favorable to the petitioner's cause than the respondent's. [8]
Others of these cases we find to be distinguishable. [9] The case at bar necessitates 1165 a factual determination and, as is frequently the situation in such cases, prior decisions are of minimal value. Each decision must turn on the facts and circumstances of the case under consideration. *119 The remainder of the cases cited by the respondent concern instances in which petitioners have failed to carry their burdens of proof. [10] For the reasons given heretofore in this opinion we find these cases inapposite. We must now turn to the second facet of this case; i.e., the determination of the amount of the petitioner's deduction. Section 165(b) provides as follows: (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. Section 1011 refers to section 1012 which provides for a cost basis. In this case the petitioner's cost basis must be adjusted by an increase in the amount of any capital *120 improvements that he made and decreased by the amount of depreciation that was allowed or allowable during the years from 1937 to 1963 [11] assuming the straight-line method had been used. [1]2 Our determination of the cost of La Tafna, Ain Kial and the capital improvements situated on La Tafna was rendered quite difficult because of the fact that the petitioner's books and records, in large part, were confiscated along with his property. Under these circumstances we arrived at our findings of fact with the best available evidence. Alvarez v. United States, an unreported case ( S.D. Fla. 1969, 24 AFTR 2d 69-5360, 69-2 USTC 9618). Although, as we stated above, there was a language barrier, we found the petitioner as well as his brother, Joseph, to be credible witnesses. However, we did not accept the petitioner's contentions undisturbed. In addition, we did not feel that the estimated useful lives of *121 the various capital improvements on La Tafna that the petitioner testified to at trial were accurate. In many instances shorter useful lives than those claimed by the petitioner were indicated by the nature of the improvements. On brief, the respondent appears to contend that due to deficiencies in the petitioner's proof we should find that he had no adjusted basis in his property. As a result of this contention the respondent offered no alternative to the petitioner's proposed findings of fact either as to cost or estimated useful life. We cannot accept the respondent's contentions. We are satisfied that the petitioner did, in fact, sustain a loss and that he had, in fact, some adjusted basis in his property as of the time of confiscation. We therefore cannot deny him relief altogether "and it is incumbent upon us to do the best we can with the materials at hand." Andrew P. Solt, 19 T.C. 183, 188 (1952). As we said in Benjamin Abraham, 9 T.C. 222, 226 (1947): It seems to us that under the facts of the instant case we should apply the doctrine announced by the court in Cohan v. Commissioner, 39 Fed. (2d) 540, and make the best approximation *122 of petitioner's loss that we can under the evidence. See also Peter S. Elek, 30 T.C. 731, 734 (1958) in which we determined a realistic rate of depreciation. As we stated in our findings of fact the original purchase price of La Tafna was $79,239.76 and the original purchase price of Ain Kial was $36,940.88. At the time of their respective purchases both properties were composed of land and buildings. The petitioner neither at the time of purchase nor at the time of trial attempted to allocate costs to one or the other of these categories. In order to effect a computation of allowable depreciation it will therefore be necessary for the Court to perform this function. See Benjamin Abraham, supra, at 226, where no evidence pertaining to allocation was given. Based on the facts appearing in the record we feel that as to both La Tafna and Ain Kial an allocation of 25 percent of the respective purchase prices to buildings and other improvements in existence at the time of purchase is reasonable. This would mean that 75 percent of $116,180.64, representing the combined purchase price of La Tafna and Ain Kial, or $87,135.48, is non-depreciable. This amount *123 would 1166 therefore constitute a portion of the petitioner's deductible loss. Additional components of the petitioner's deductible loss would be his adjusted bases in the buildings and other improvements situated on La Tafna and Ain Kial at the time of purchase. The unadjusted cost of these items was $19,809.94 for La Tafna and $9,235.22 for Ain Kial. The remainder of the petitioner's deductible loss is composed of the amount of capital expenditures incurred for the improvement of La Tafna together with amounts expended for equipment used in the operation of the farm. The petitioner's unadjusted bases in these items are set forth in the table contained in our findings of fact, supra. In order to arrive at the petitioner's adjusted bases for these items, as well as the buildings and improvements originally on La Tafna and Ain Kial, and thereby his deductible loss, it is necessary to reduce each of these by the amount of allowable depreciation allocable thereto. For the reasons stated heretofore, it is necessary for us to find some method to reasonably estimate the useful lives of the items at issue. Peter S. Elek, supra, at 734; Andrew P. Solt, supra, at 188-89; *124 Benjamin Abraham, supra, at 227. In so doing we will adhere to, for the most part, Bulletin "F." [13] For situations in which Bulletin "F" appears inapplicable we will estimate useful life to the best of our ability, considering all facts and circumstances appearing in the record. We wish to note here another general guideline which we have adhered to in our efforts to arrive at reasonable adjusted bases for the petitioner's property. We have, in cognizance of the petitioner's burden of proof, ignored the concept of salvage value which if included could have the effect of increasing the petitioner's adjusted basis. No evidence was offered from which an estimate of salvage value could be drawn. Our estimates of the useful lives of the items in question are reflected in the following table: *125 1167 *10
Year
Depreciation
Year of
Useful
Depreciation
Allowable
Improvement
Acquisition
Life
[1] Began [2] Years Amount
Originally on La Tafua (Cost $19,809.94)
1937
40
1937
26.5
$13,124.09
Originally on Ain Kial (Cost $9,235.22)
1961
40
1961
2.5
577.20
Ground Preparation for Vines (53 Hectares)
1944-45
33
1945
18.5
9,398.26
Planting Grape Vines (11 Hectares)
1948
33
1955
8.5
10,645.52
Planting Grape Vines (14.5 Hectares)
1948-49
33
1956
7.5
41,600.41
Planting Grape Vines (11.48 Hectares)
1951-52
33
1959
3.5
5,065.66
Planting Grape Vines (5.3 Hectares)
1954
33
1961
2.5
1,516.52
Planting Grape Vines (14.5 Hectares)
1955
33
1962
1.5
2,077.92
Planting Grape Vines (10.58 Hectares
1961-62
33
1969
47,067 Citrus Trees
1951-61
40
1968
40,000 Cyprus Trees
1951-61
15
1968
800 Olive Trees
1938-39
50
1968
3,000 Olive Trees
1955-59
50
1988
2,450 Almond Trees
1957-59
40
1973
800 Pine Trees
1945-54
15
1961
2.5
580.57
4,900 Peach, Apple, Pear Trees
1957-60
15
1967
600 Prune, Apricot, Medlar Trees
1945-50
25
1957
6.5
2,023.56
400 Cubic Meter Water Tank (Concrete)
1938
33
1938
25.5
24,395.49
Zinc Gutter System
1946-47
25
1947
16.5
1,559.10
Cattle Stable
1938
40
1938
25.5
10,901.73
Wine Factory
1938
50
1938
25.5
73,796.29
Wine Factory Enlargement
1939-40
50
1940
23.5
26,765.38
Wine Machinery
1939
15
1939
15
79,726.65
Manager's Dwelling
1938
50
1938
25.5
30,676.14
Caretaker's Dwelling
1939
50
1939
24.5
11,161.73
Loading Platform
1939
40
1939
24.5
2,092.83
Water Conduit Gallery & Reservoir (Cement)
1942-43
50
1942
21.5
5,406.54
Water Tower (Concrete & Iron)
1947
35
1947
16.5
5,568.19
Cistern (Concrete)
1947
33
1947
16.5
3,352.84
Storage Ditches (Cement)
1948
50
1948
15.5
232.94
Workers' Dwellings
1949
50
1949
14.5
2,077.36
Reservoir (Concrete)
1949
33
1949
14.5
1,888.51
Piping (Steel)
1949
40
1949
14.5
2,077.36
850 Meter Road
1950
20
1950
13.5
1,543.30
100,000 Liter Petroleum Tank (Cement & Metal)
1952
25
1952
11.5
624.38
Pumping Station Floor
1952
40
1952
11.5
164.31
Motor Pump & Installation
1952
15
1952
11.5
985.92
Piping (Cast Iron)
1952
25
1952
11.5
65.72
Electrical Transformer
1952
15
1952
11.5
883.94
Pumping Station
1955
40
1955
8.5
607.14
Telephone Installation
1955
15
1955
8.5
113.33
Cast Iron Pipe 200 Millimeters
1960
25
1960
3.5
856.62
Hanomag Tractor
1952
10
1952
10
10,744.39
2 Bolinders Tractors
1959
10
1959
4.5
3,300.06
Harvester (Used)
1961
5
1961
2.5
102.04
Sprayer (Used)
1961
5
1961
2.5 153.06
Total Depreciation Allowable
$388,433.00
*126 1168 The final component of the petitioner's deduction is $22,439.82 which represents the cost of 1450 hectoliters of wine confiscated with La Tafna. This amount when added to the unadjusted bases of Ain Kial and La Tafna together with the cost of the items detailed in the above table totals $1,726,254.05. From this amount $104,466.07 must be subtracted. This represents damage occasioned in 1947 by a severe hailstorm, 1954 by a flood and 1958 by arson. Although there was testimony at trial to the effect that a substantial part of this damage was repaired, it is our opinion that in this regard the petitioner has failed to carry his burden of proof. Since the property represented by the above amount of $104,466.07 was not on La Tafna in 1963 it cannot constitute part of the petitioner's deductible loss. The petitioner's basis in his property must be further reduced by $388,433, the amount of allowable depreciation reflected in the above *127 table. These various reductions leave a total deductible adjusted basis of $1,233,354.98. In accordance with the foregoing and to reflect concessions by the petitioner, Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
1. - The currency exchange rates applicable to the years involved were stipulated by the parties by joint exhibit. The source of the information was the International Monetary Fund, International Financial Statistics.so ↩
2. - The length of development describes the period of time before a particular agricultural improvement could become productive. ↩
3. - Since no rate of exchange was offered by the petitioner for 1942-1944 we have assumed that the rate was identical to that for 1945. This assumption favors the respondent when one considers that the rate of exchange in 1941 was 43.9 old francs to the dollar. This "favoritism" is appropriate due to the petitioner's failure of proof. ↩
4. - When it appears that an expenditure was made over a two-year period and the petitioner has failed to make an allocation, we merely averaged the prevailing rates for the two-year period. ↩
5. - In several instances it appears that an expenditure was incurred evenly over a period of several years and the petitioner failed to offer evidence with which we could make an allocation for purposes of the exchange rate. In such cases we used the rate prevailing in the median year. When the period of an expenditure encompassed an even number of years we used the average rate of the two median years. ↩
6. - See footnote 3, supra. ↩
7. - The parties failed to offer the rate of exchange for 1952. We assumed the rate in that year to be 349.95 old francs to the dollar because the rates in 1951 and 1953 were 349.95.↩
2. 5,942,000 old francs was the amount of damage estimated by the Algerian Government; however, Joseph testified that the actual damages were 50 percent greater than this.↩
3. We note here that we have not included in the cost of Ain Kial certain other expenses of purchase which the petitioner alleges were paid. We have excluded this amount, i.e., 229, 163 old francs, due to the petitioner's failure of proof. The amount that we have included was agreed upon by the parties on brief.↩
4. The discrepancy between the amount that the petitioner deducted, $1,498,524, and the amount the respondent disallowed was not explained by the parties.↩
5. As the respondent points out, on brief, it is unnecessary for us to decide whether paragraph (1) or (2) is applicable here, as long as the properties in question fall into one or the other category. Sec. 167, I.R.C. 1954 allows depreciation on both categories. Secs. 1222 and 1211 do not apply, because a seizure is not a sale or exchange and under sec. 1231, I.R.C. 1954↩, due to the fact that all of the property was held for at least six months, once the petitioner establishes that he has suffered a loss he would be entitled to an ordinary deduction in the year of loss - the only year in issue here.
6. This factual pattern is of course distinguishable from an earlier decree and a later implementation, in which case the decree is the operative factor. E. g., Erwin de Reitzes-Marienwert, 21 T.C. 846 (1954). In this regard, also, Rev. Rul. 62-197, 1962-2 C.B. 66, 69, states in contradiction of the respondent's present position: In situations in which there has been seizure, intervention in, or similar taking of property * * * followed by expropriation evidenced by an officially published expropriation decree * * *, the loss will be considered to have been sustained at the time of the seizure, intervention, or taking rather than at the later date of the decree * * *. We would also note here that the abovementioned revenue ruling, again in contradiction of the respondent's instant position, defines an act of confiscation as occurring "when the taxpayer has been deprived of ownership of property or by normal attributes of ownership, such as receipt of income and control over the operation or use of the property * * *." Id. at 69↩.
7. The respondent does not argue that the decree is not authentic because it was forwarded to the petitioner by his tenant rather than officially published and we have no doubt of its veracity.↩
8. E. g., Boehm v. Commissioner, 326 U.S. 287 (1945); S.S. White Dental Mfg. Co., 274 U.S. 398 (1927); Harry J. Colish, 48 T.C. 711↩ (1967).
9. E. g.: In Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130 (1960), the United States Government paid the taxpayer the fair rental value of its property for temporary wartime use of less than one year. In Erwin de Reitzes-Marienwert, 21 T.C. 846, 851 (1954), we stated that the transfer in question "was made at the voluntary instruction of the petitioner and cannot be considered a seizure or confiscation." In Ernest Adler, 8 T.C. 726, 732 (1947), we concluded that in order to be entitled to a loss deduction the petitioner must establish that he owned the property. In the instant case, as set forth in our findings of fact, the petitioner has established this requisite. See also, Dezso Goldner, 27 T.C. 455↩ (1956).
10. E. g., Bernhard Altmann, 20 T.C. 236 (1953) vacated and remanded on other grounds in an unpublished order ( C.A. 2, 1955, 55-2 USTC 9599, 49 AFTR 1867); Ranschburg v. United States, an unreported case ( S.D.N.Y. 1965, 16 AFTR 2d 5308, 65-2 USTC 9485↩).
11. Sec. 1016(a)(2), I.R.C. 1954; Sec. 1.1016-3 (a)(1)(i), Income Tax Regs.
For plantings we have considered that depreciation would have begun with the end of the development period. [1]2 Sec. 1016(a)(2), 167(b)(1), I.R.C. 1954; Sec. 1.1016-3(a)(2)(i), Income Tax Regs.↩
13. Bulletin "F", I.R.S. Publication No. 173, was superseded by Rev. Proc. 62-21, 1962-2 C.B. 418. However, Rev. Proc. 62-21↩ was made applicable to the preparation of tax returns due after the date of publication, i.e., July 12, 1962. Therefore, since Bulletin "F" was in force during most of the years in question, it will be our principal guide.
2. Concerning improvements on La Tafna for purposes of allowable depreciation we will consider 1963 as 1/2 of a taxable year.↩